**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **BITHARMONY LLC,** | |
| **Plaintiff,** | **Civil Action No. _____** |
| **vs.** | |
| **AMAZON.COM, INC. AND AMAZON.COM SERVICES, LLC,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*., in which Plaintiff BitHarmony LLC ("BitHarmony") alleges as follows against Amazon.com, Inc. ("Amazon.com"), and Amazon.com Services LLC (Amazon.com Services) (collectively, "Amazon"):

### NATURE OF THE ACTION

1.     This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*. BitHarmony alleges that Amazon has infringed and/or continue to infringe, directly and/or indirectly, the following BitHarmony patents: U.S. Patent Nos. 7,707,485 ("'485 patent"), 9,088,805 ("'805 patent"), 9,258,605 ("'605 patent"), 9,124,954 ("'954 patent) and 9,826,259 ("'259 patent"), collectively, the "Asserted Patents," copies of which are attached hereto as Exhibits 1-5.

2.     More specifically, this case is about Amazon's infringement of BitHarmony's Asserted Patents through Amazon's video streaming products and services, including Amazon Prime Video and Amazon.com videos.

## BACKGROUND

3.    Indra Laksono ("Laksono")—a named inventor on most of the Asserted Patents—is a renowned scientist, inventor and entrepreneur. Laksono holds a Master of Science degree in Computer Science and Bachelor of Science degrees in Computer Science and Mathematics from the University of Toronto, and is the named inventor on over 90 issued U.S. and international patents, including in video codecs and streaming.

4.    Laksono's career included a number of senior positions at ATI Technologies, Inc. ("ATI") (a well-known graphics and multimedia semiconductor company) in various engineering and design roles.

5.    Laksono left ATI and co-founded ViXS Systems, Inc. ("ViXS"), with others from ATI, in approximately 2001 with the idea and goal of improving video streaming technologies. And this is precisely what Laksono and ViXS accomplished.

6.    Laksono served as the Chief Technology Officer (CTO) of ViXS from its founding through acquisition. In that role, he oversaw software engineering, R&D, ASIC architecture, application development, and technology strategy.

7.    Under his technology leadership, ViXS became a pioneering multimedia solutions innovator providing technologies for processing, managing, securing and distributing high-quality video and audio allowing seamless multimedia control, conversion, and connectivity to and between many classes and sizes of digital entertainment devices.

8.    ViXS, headquartered in Toronto, Canada, was a leading fabless semiconductor company that developed innovations enabling advanced transcoding and video processing technologies. Among other things, ViXS drove the transition to Ultra HD 4K across the value chain through its semiconductor chips by developing the world's first transcoder chip to support

10-bit Ultra HD 4K and High Efficiency Video Codec (HEVC). *See, e.g.*,

https://www.prnewswire.com/news-releases/vixs-announces-xcode-pro-350---worlds-first-transcoder-chip-to-support-10-bit-ultra-hd-4k-and-high-efficiency-video-codec-hevc-201612871.html.

9.      ViXS received industry recognition and awards, including being listed for four years running as one of Deloitte's fastest growing North American companies.

10.     ViXS built a large patent portfolio (video processing, codecs, media-streaming, and other technologies) to protect ViXS's valuable innovations. ViXS's relentless innovation resulted in over 470 patents issued and pending worldwide at the time of its acquisition in 2017 by Pixelworks, Inc. ("Pixelworks"), a leading provider of visual processing solutions. *See, e.g.*,

https://www.sec.gov/Archives/edgar/data/1040161/000104016117000037/ex991closingpressrelease.htm.

11.     Upon acquisition, Laksono joined Pixelworks as President, Pixelworks Canada.

12.     The patents in this action describe and claim some of the extraordinary inventions developed by Laksono and/or ViXS.

**THE PARTIES**

13.     Plaintiff BitHarmony is a Delaware limited liability company with its principal place of business at 1000 N. West St., Suite 1400, Wilmington, DE 19801.

14.     BitHarmony owns patents covering foundational video streaming technologies, including the patents asserted in this case resulting from the pioneering work and inventions at ViXS.

15.     BitHarmony holds all substantial rights and interest in the Asserted Patents, including the exclusive right to sue Amazon for infringement and recover damages.

16. Defendant Amazon.com is a Delaware corporation, with its principal place of business and original headquarters at 410 Terry Avenue North, Seattle, WA 98109 and its second/East Coast headquarters in this District in Arlington, VA. Amazon.com maintains a regular and established place of business in this District through multiple permanent physical facilities, including Amazon's East Coast headquarters. On information and belief, Amazon.com owns and/or leases the property for its East Coast headquarters, including at 241 18th St. South, Arlington, VA 22202; 1770 Crystal Dr., Arlington, VA 22202; 2100 Crystal Dr., Arlington, VA 22202; 2345 Crystal Dr., Arlington, VA 22202; and 1800 South Bell St., Arlington, VA 22202. *See, e.g.*, https://www.aboutamazon.com/news/amazon-offices/amazon-opens-offices-at-hq2-in-arlington-va; https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/e42c2068-bad5-4ab6-ae57-36ff8b2aeffd.pdf (Amazon's Form 10-K for fiscal year ending December 31, 2024 at page 18 stating "We own and lease our corporate headquarters in Washington's Puget sound region and Arlington, Virginia."); https://www.arlnow.com/2019/04/03/breaking-jbg-smith-inks-agreements-with-amazon/ (Amazon leasing and buying sites for East Coast headquarters in Arlington).

17. Defendant Amazon.com Services is a Delaware limited liability company with a principal place of business at 410 Terry Avenue North, Seattle, Washington 98109. It is a wholly owned subsidiary of Defendant Amazon.com. and identified as an Amazon Group company along with Defendant Amazon.com. *See, e.g.*, https://www.amazon.com/gp/help/customer/display.html?nodeId=202137190. On information and belief, Defendant Amazon.com Services operates Amazon Prime Video, and is one of the providers of the Accused Products. On information and believe Defendant Amazon.com Services maintains a regular and established place of business in this district through multiple permanent

physical facilities such as its second/East Coast headquarters. On information and belief, Amazon.com Services has been authorized to transact business in the Commonwealth of Virginia and the Eastern District of Virginia since on or about March 9, 2020, under Virginia Entity ID 11014339. *See, e.g.*,

https://cis.scc.virginia.gov/EntitySearch/BusinessInformation?businessId=11014339&source=FromEntityResult&isSeries%20=%20false- SCC.

18.    Amazon has committed and continues to commit acts of patent infringement of the Asserted Patents including by making, using, selling, offering for sale, and/or importing infringing apparatuses and systems and performing infringing methods.

19.    Amazon currently benefits from and has benefitted greatly from BitHarmony's innovations, which enable the Amazon Accused Products to stream, store, and transmit high quality video more efficiently and effectively.

## JURISDICTION AND VENUE

20.    This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 101 *et seq.*

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

22.    This Court has specific and general personal jurisdiction over Amazon consistent with the requirements of the Due Process Clause of the United States Constitution and the Virginia Long-Arm Statute. Va. Code Ann. § 8.01-328.1. On information and belief, each Defendant has sufficient minimum contacts with the forum because each Defendant transacts substantial business in the Commonwealth of Virginia and in this District.

23.    Defendant Amazon.com has substantial contacts with the forum as a consequence of actively establishing its second headquarters in Virginia and in this District, and Amazon.com conducts substantial business in Virginia. Amazon's 10-K filing with the SEC for fiscal year ending on December 31, 2024, states that "[w]e own and lease our corporate headquarters in Washington's Puget Sound region and Arlington, Virginia." Amazon.com sells, makes, uses, and offers for sale its products and services, including products and services that infringe BitHarmony's Asserted Patents, within the Commonwealth of Virginia, including to customers in Virginia. As a court in this District has observed in April 2020: "It must be said that Amazon is nothing if not ubiquitous in the United States. Furthermore, after considering 238 cities, Amazon chose Arlington in the Eastern District of Virginia as the location for its HQ2, and will invest $2.5 billion and 25,000 jobs in the undertaking. As such, Amazon cannot in good faith represent to the Court that E.D. Va. is an undesirable or inconvenient location to operate and do business. Litigating should not be an additional significant strain." *Maglula, Ltd. v. Amazon.com, Inc.,* No. 1:19-cv-01570, 2020 WL 9536937, at *16 (E.D. Va. Apr. 9, 2020). Further, in 2022, Amazon.com admitted in a district court filing that engineers who "work on the design and development of video streaming on Prime Video" are located in Arlington, Virginia. *See Wag Acquisition, LLC v. Amazon.com, Inc.*, No. 21-cv-000815, ECF No. 30-82 at 1 (W.D. Tex. Jan. 6, 2022). Further, in the Eastern District of Virginia case of *DivX, LLC v. Amazon.com*, No. 1:24-0261, a patent infringement case involving video streaming technologies, Amazon.com did not contest personal jurisdiction. ECF No. 58 (Answer dated May 5, 2025) at ¶ 32 ("Amazon admits that Amazon.com conducts some business in the Commonwealth of Virginia, and does not contest, for purposes of this case only, that the Court has personal jurisdiction over it.").

24.    Defendant Amazon.com Services has substantial contacts with the forum as a consequence of actively establishing its second headquarters in Virginia and in this District, and Amazon.com Services conducts substantial business in Virginia. Defendant Amazon.com Services, a key operating subsidiary of Amazon.com, is responsible for much of the company's fulfillment, logistics, operational workforce, and Amazon Prime Video streaming services (including platform operations, content delivery, and related digital services). Defendant Amazon.com Services maintains deep and significant connections to the Commonwealth of Virginia through Amazon.com's broader ecosystem as identified above. Defendant Amazon.com Services sells, makes, uses, and offers for sale its products and services, including products and services that infringe BitHarmony's Asserted Patents, within the Commonwealth of Virginia, including to customers in Virginia. Further, in 2022, Amazon.com Services admitted in a district court filing that engineers who "work on the design and development of video streaming on Prime Video" are located in Arlington, Virginia. *See Wag Acquisition, LLC v. Amazon.com, Inc.*, No. 21-cv-000815, ECF No. 30-82 at 1 (W.D. Tex. Jan. 6, 2022).

25.    Further, as to Amazon, and for example, Virginia serves as the heart of subsidiary Amazon Web Services (AWS) operations, hosting the company's first data centers since 2006 and the majority of its US East (N. Virginia) region facilities across counties like Loudoun, Fairfax, Prince William, and beyond — infrastructure that powers much of Amazon Prime Video's global streaming delivery, content distribution, and scalability.

26.    Amazon has committed and continues to commit acts of patent infringement, including by making, using, selling, offering for sale and/or importing into the United States, and within this District, products and services, such as video content on Amazon.com and Amazon Prime Video, in a manner that infringes the Asserted Patents by, for example, implementing or

being capable of implementing the transcoding, storage, key encryption/decryption, and/or content recognition claimed in the Asserted Patents.

27.    Venue is proper for Amazon in this District under 28 U.S.C. §§ 1391(b) and (c), and 1400(b) because, as described above, a substantial part of the events giving rise to BitHarmony's claims occurred in this District, and because Amazon, with its second headquarters in Arlington, VA, resides within this District. Amazon has regular and established places of business within this District with employees in this District and transacts business within the district regularly. Amazon.com has pled in legal filings that venue in this District is proper. In a 2020 action filed by Amazon.com in this District, Amazon.com asserted that venue was proper under 28 U.S.C. § 1391(b) because, among other things "it is a district in which Plaintiff [Amazon.com] maintains headquarters and/or substantial business operations...." *Amazon.com, Inc. v. WDC Holdings LLC*, No. 1:20-cv-484, ECF No. 1, ¶ 26 (E.D. Va. Apr. 27, 2020). Further, in the Eastern District of Virginia case of *DivX, LLC v. Amazon.com*, No. 1:24-0261, a patent infringement case involving video streaming technologies, Amazon.com did not contest venue. ECF No. 58 (Answer dated May 5, 2025) at ¶ 35 ("Amazon admits that it maintains its East Coast headquarters in Arlington, Virginia, within the Eastern District of Virginia, and does not contest, for purposes of this case only, that venue is proper under 28 U.S.C. §§ 1391 and 1400.").

## THE ASSERTED PATENTS

### U.S. Patent No. 7,707,485

28.    The '485 patent, entitled "System and method for dynamic transrating based on content," lawfully issued on April 27, 2010. A true and correct copy of the '485 patent is attached as Exhibit 1.

29.     The '485 patent names Indra Laksono as inventor.

30.     BitHarmony owns by assignment the entire right and title in and to the '485 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

31.     The written description of the '485 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what has been considered conventional or generic in the art at the time of the invention.

32.     The '485 patent claims are directed to addressing problems specific to particular computing and media processing technologies, including the constraints of storage space and network bandwidth in digital video environments, specifically the inability of prior systems to optimize data efficiency without "indiscriminately" sacrificing quality, which the patent resolves by dynamically modifying encoding parameters (such as bit rate or resolution) in response to real-time analysis of content characteristics like volume changes or motion vectors. '485 patent at 1:10-26; 1:61-2:11; 4:8-58; 6:26-7:5; 7:33-8:7.

33.     The '485 patent provides background information about the tradeoffs inherent in pre-existing video processing architectures used for video distribution. '485 patent at 1:10-26. The patent explains that conventional multimedia solutions forced a rigid trade-off between content quality and storage space, resulting in either indiscriminate quality reduction or limited cost-effective storage capacity. *Id.* at 1:19-26. This created a scenario where the choice was between two flawed approaches, e.g., either "indiscriminately reduce content quality" to

minimize the space required to store the data, or elect to retain high content quality, which severely limits the amount of data that can be stored in a "cost-effective manner." *Id.*

34.    To address the "bandwidth limitations of the network" inherent in modern streaming environments, the solution implements a "dynamic transrating" system that modifies streams in real-time based on specific content analysis. *Id.* at 4:9-14; 7:33-8:7. Rather than using a static encoding profile, the system selects a "rules template" that is "indexed not only by, for example, program type, but also by one or more characteristics of the multimedia device... and/or the network…." *Id.* at 4:14-29.

35.    Existing systems and methods for multimedia content distribution and storage can impose technical burdens or fail to adequately balance content quality against storage space and bandwidth limitations. *See generally id.* at 1:19-26. Specifically, conventional solutions often "elect to indiscriminately reduce content quality," thereby degrading the viewer experience, or "elect to retain content quality," which severely limits the amount of data that can be stored or transmitted in a "cost-effective manner. *Id.* This led to problems and unnecessary expense, because data was either wasted on portions of the program users do not value—such as commercials where users "typically do not pay as much attention"—or the quality of the entire stream was reduced to meet the "data storage limitations of the multimedia device and/or bandwidth limitations of the network." *Id.* at 3:12-18; 4:9-14. The '485 patent addresses these burdens by implementing "dynamic transrating based on content," where a "transrater" analyzes content characteristics to selectively modify the bit rate or resolution of specific portions of the data, ensuring the "modified multimedia data" retains quality where it matters while reducing file size elsewhere. *Id.* at Title; 3:12-4:30.

36.    The inventive benefits of the '485 patent over prior solutions primarily stem from its approach to utilizing context-aware "rules templates" to drive encoding decisions based on "program information," rather than applying a single static compression standard across the entire file, which allows the system to "reduce the overall amount of multimedia data without materially affecting the multimedia content of the program that a viewer is likely to care about." 2:45-4:30. This patented solution enables granular control where "content actions" like "changing a bit rate" or "changing a resolution" are triggered by specific events—such as a "change in average audio volume" or specific motion vector analysis—addressing prior art limitations where solutions had to indiscriminately reduce content quality to meet the bandwidth limitations of the network. *Id.* at 3:5-4:29. These features collectively overcome the inefficiencies, inflexibility, and vulnerabilities of conventional approaches that force a rigid choice between "content quality or storage space." *Id.* at 1:19-20.

37.    The systems and methods claimed in the '485 patent provide a dynamic technique for transrating multimedia information based on specific content characteristics found within the stream. Claim 1, for example, recites a multimedia processing device that incorporates multiple inventive concepts described in the '485 patent, including "identifying a select template... based on the program," "analyzing the multimedia content... to determine characteristics of the multimedia content," and "modifying... the multimedia data based on an application of the plurality of rules of the select template to the characteristics of the multimedia content." Claim 1 offers a particular "how" for transcoding the multimedia data: systematically selecting actions—such as changing a bit rate, resolution, or audio volume—when specific content characteristics are detected during analysis. *Id.* at claim 1.

38.    The '485 patent claims are directed to a specific improvement in the functioning of video transcoding hardware, specifically the automated selection of encoding parameters driven by rule-based content analysis, rather than an abstract idea. Furthermore, it contributes a significant inventive advantage by allowing aggressive data reduction on less important segments like commercials while retaining quality for primary content, solving a unique resource allocation dilemma between quality and storage space in video systems. The patent introduces a unique hardware-based, on-the-fly approach where detection of characteristics (like volume spikes or motion) and corresponding content actions are tightly coupled with the video processing pipeline, thus facilitating optimization of the data stream for specific devices or networks. This integration is a specific technical implementation that provides a distinct performance advantage over generic transcoding solutions.

### U.S. Patent No. 9,088,805

39.    The '805 patent, entitled "Encrypted memory device and methods for use therewith," lawfully issued on July 21, 2015. A true and correct copy of the '805 patent is attached as Exhibit 2.

40.    The '805 patent names Paul D. Ducharme as inventor.

41.    BitHarmony owns by assignment the entire right and title in and to the '805 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

42.    The written description of the '805 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from

and improved upon what has been considered conventional or generic in the art at the time of the invention.

43.     The '805 patent claims are directed to addressing problems specific to particular computing and media processing technologies, including the "security risk" inherent in traditional buffering where "clear compressed content resides in memory for a period of time," specifically the exposure that allows unauthorized parties to "read and export the compressed content" from the buffer. '805 Patent at 1:25-2:24. The patent resolves this problem by employing a secure storage architecture where "memory input/output (I/O) includes encryption and decryption as part of an atomic operation" ensuring that unencrypted content is automatically encrypted. '805 Patent at 19:4-15.

44.     The '805 patent provides background information about the security risks and inefficiencies associated with managing "Encrypt[ed] Video/Audio Compressed content" using a variety of "container formats." *Id.* at 1:25-27. The patent explains that conventional solutions had the following problems: "the process of decrypting compressed content at the container level is an expensive process which involves multiple transfers to/from memory" and "consumes bandwidth." *Id.* at 1:65-2:1. This created a scenario where a "security risk" exists because "clear compressed content resides in memory for a period of time," allowing hackers to "attempt to read and export the compressed content." *Id.* at 2:1-3.

45.     To address the "security risk" inherent in convention systems, the patented solution implements a secure architecture where "memory input/output (I/O) includes encryption and decryption as part of an atomic operation." *Id.* at Abstract; *see also id.* at 18:10-19:15.

46.     The patented solution enables secure operations and collectively overcomes the inefficiencies and vulnerabilities of conventional approaches by ensuring "the clear compressed

content is not exposed in memory." *Id.* at 18:39-67. The systems and methods claimed in the '805 patent provide a secure video processing architecture that protects data integrity via automatic encryption upon storage.

47.     Claim 1, for example, recites a "key generator," a "memory device," and "an interface device . . . that receives the video data in a media format and unconditionally encrypts the video data into encrypted video data based on the encryption key and stores the encrypted video data in the memory device." Claim 1 offers a particular "how" for protecting content by utilizing a "video encoder . . . that automatically decrypts the encrypted video data based on the corresponding decryption key when retrieving the encrypted video data from the memory device."

48.     The '805 patent claims are directed to a specific improvement in the functioning of video processing hardware, such as an interface that "unconditionally encrypts the video data" and a "video decoder" that "automatically decrypts the encrypted video data… in conjunction with an encoding of the video data," rather than an abstract idea. Furthermore, it contributes a significant inventive advantage by embedding "encryption/decryption" in the encoding pipeline, solving a unique security weakness in modern security devices where clear content is exposed in memory. The patent introduces innovative features that provide that solution. This specific technical implementation provides "reduced memory bandwidth" and "less latency" over generic conventional solutions. *Id.* at 18:39-63.

**U.S. Patent No. 9,124,954**

49.     The '954 patent, entitled "Video processing device for generating time-coded metadata based on a search and methods for use therewith," lawfully issued on September 1, 2015. A true and correct copy of the '954 patent is attached as Exhibit 3.

50.     The '954 patent names Indra Laksono, John Pomeroy, and Sally Jean Daub as inventors.

51.     BitHarmony owns by assignment the entire right and title in and to the '954 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

52.     The written description of the '954 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the non-conventional and non-generic combination of claim limitations is patently distinct from and improved upon what has been considered conventional or generic in the art at the time of the invention.

53.     The '954 patent claims are directed to addressing problems specific to particular computing and media processing technologies, including the static nature of traditional video presentation which has failed to evolve alongside the proliferation of content sources, the technical challenges of automatically identifying relevant external information via speech or image recognition and synchronizing it with specific video timestamps, and the difficulty of formatting this enhanced content so that it remains compatible with legacy video decoding devices while offering advanced features to compatible display. '954 patent at 1:30-49; 20:55-22:41.

54.     The '954 patent provides background information about the issues inherent in pre-existing video sources, noting that while "users are faced with an ever expanding array of content and services" ranging from traditional "broadcast television" to "web services [that] offer streaming services," the mechanisms for delivering this content has stagnated. *Id.* at 1:30-49. The patent explains that because "the fundamental presentation of video programming has changed

very little" even though "consumption of media is evolving rapidly," there is a disconnect where "metadata, e.g. information, relevant to that media" exists in "alternative information sources" but is not utilized. *Id.*; *see also id.* at 3:11-19. This creates a technical gap where video remains a static format without context, necessitating a system that "can mine alternative information sources" to "integrate relevant metadata to content being processed" and allow users "to understand a video in new ways." *Id.* at 3:25-34, 4:5-19.

55.    One way to understand a video in new ways is to automate the identification of objects and dialogue within the stream to trigger relevant external searches. The '954 patent describes a video processing device where "the content recognition data" is used to "recogniz[e] video content in the video signal as corresponding to the at least one keyword" associated with the media content. *Id.* at 4:49-7:6; claim 1. This process relies on, for example, recognition of data "included in the video signal," ensuring that "time-coded metadata" is generated "in accordance with the at least one timestamp" to synchronize the new information with the video content. *Id.*

56.    Existing methods for obtaining new information from the video content can impose burdens, e.g., restricting viewers to a "fundamental presentation of video programming [that] has changed very little" despite the explosive growth of available data sources. *Id.* at 1:30-49. Specifically, the reliance on static or manually curated media led to problems and unnecessary expense, as it prevented "accurate, efficient and profitable advertising delivery" and failed to provide the automated context necessary for users "to understand a video in new ways." *Id.* at 4:5-19, 16:2-10.

57.    The '954 patent specification addresses these burdens by utilizing a "content analyzer" that "uses speech recognition . . . [and/or] image recognition" to automatically "mine

alternative information sources for new information pertaining to a video signal," thereby creating "time-coded metadata" derived directly from the observed visual and audio content. *Id.* at 4:5-19, 5:29-49; *see also id.* at claim 1.

58.    The inventive benefits of the '954 patent over prior solutions primarily stem from its approach of utilizing a "content analyzer" that "generates content recognition data based on the video signal," e.g., via "speech recognition" or "image recognition," rather than maintaining a static format where "the fundamental presentation of video programming has changed very little," which allows the system to mine alternative information sources for new information pertaining to a video signal. *Id.* at claims 1-3, 1:30-49, 4:5-19. These features collectively overcome the inefficiencies and inflexibility of prior "conventional and traditional" methods, helping the user "to understand a video in new ways." *Id.* at 1:30-49, 4:5-19.

### U.S. Patent No. 9,258,605

59.    The '605 patent, entitled "System and method for transrating based on multimedia program type," lawfully issued on February 9, 2016. A true and correct copy of the '605 patent is attached as Exhibit 4.

60.    The '605 patent names Lewis Leung and Indra Laksono as inventors.

61.    BitHarmony owns by assignment the entire right and title in and to the '605 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

62.    The written description of the '605 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from

and improved upon what has been considered conventional or generic in the art at the time of the invention.

63.    The '605 patent claims are directed to addressing problems specific to particular computing and media processing technologies, including the rigid management of storage resources and bandwidth in multimedia distribution, specifically the inability of prior systems to adapt encoding constraints to the specific genre of content, which the disclosure resolves by establishing "peak bit rate" and "average bit rate" limits based on the "multimedia program type" and dynamically scaling these limits. '605 patent at 2:23-39; 6:64-11:39.

64.    The '605 patent provides background information about the tradeoffs inherent in pre-existing video processing architectures used for video distribution. The disclosure explains that conventional multimedia storage solutions face a "choice of either content quality or storage space," resulting in either indiscriminate quality reduction or limited cost-effective storage capacity. *Id.* at 1:20-36. This created a scenario where the choice was between two flawed approaches, e.g., either "indiscriminately reduce content quality content, thereby reducing the space required to store the data," or elect to "retain content quality, thereby limiting the amount of data that may be stored in a cost-effective manner." *Id.*

65.    To address the "limited capacity to store additional multimedia data" inherent in recording environments, the solution implements a "transrating based on multimedia program type" system that establishes encoding constraints. *Id.* at Title; Fig. 5; 10:31-11:29. Rather than solely relying on content characteristics, the system selects a "peak bit rate limit" and an "average bit rate limit" specific to the program content. *Id.* at 6:64-11:29.

66.    Existing systems and methods for multimedia content distribution can impose technical burdens or fail to adequately balance content quality against bandwidth limitations.

Specifically, conventional solutions often "elect to indiscriminately reduce content quality content," thereby degrading the viewer experience, or "elect to retain content quality," which can affect bandwidth. *Id.* at 1:20-36. This led to problems and unnecessary expense, because encoding resources were inefficiently allocated without regard to the "multimedia program type"—for example, treating a "drama program" characterized by "relatively little motion" the same as a "football game." *Id.* at 8:30-60. The '605 patent disclosure addresses these burdens by determining a "peak bit rate limit" and an "average bit rate limit" based on the "multimedia program type," ensuring that the "transrated multimedia data" retains appropriate quality for its genre while accounting for the network bandwidth. *Id.* at Abstract; 2:6-39; 3:54-65.

67.     The inventive benefits of the '605 patent over prior solutions stem from its approach to utilizing "multimedia program type" to determine "peak bit rate" and "average bit rate" limits, rather than applying a single static compression standard across the entire file, which allows the data generated by the transrating process to be modulated according to the capabilities of the device and the network bandwidth. *Id.* at 8:61-11:29. This patented solution enables adaptive control where bit rate limits are adjusted according to the media content, addressing prior art limitations where solutions had to "indiscriminately reduce content quality" regardless of the specific genre requirements. *Id.* at 1:20-36. These features collectively overcome the inefficiencies, inflexibility, and vulnerabilities of conventional approaches that force a rigid choice between content quality or data associated with the stream.

68.     The systems and methods claimed in the '605 patent provide a targeted approach to bandwidth and storage management by tailoring bit rate constraints to the specific nature of the multimedia content. Claim 19, for example, recites a system that incorporates multiple inventive concepts described in the '605 patent, including a "content analyzer... configured to"

(1) "determine a multimedia program type" and (2) "determine a peak bit rate limit and an average bit rate limit based on the multimedia program type." Furthermore, it includes a "transcoder... configured to transrate the multimedia data to generate transrated multimedia data having a peak bit rate not greater than the peak bit rate limit." Claim 19 offers a particular "how" for transcoding the multimedia data: systematically deriving distinct operational limits (peak versus average bit rates) from the identified program type and enforcing these limits during the transrating process to optimize resource usage.

69.     The '605 patent claims are directed to a specific improvement in the functioning of video transcoding hardware, specifically the dynamic calibration of encoding parameters based on program classification, rather than an abstract idea. Furthermore, it contributes a significant inventive advantage by enabling different rate profiles for different program types—such as allowing higher peaks for fast moving content sports while restricting averages for news—solving a unique optimization problem in video systems regarding the efficient use of storage and transmission bandwidth. The patent introduces a unique hardware-based approach where program content and rate control logic are tightly coupled with the video transcoding pipeline, thus facilitating automated compliance with varying network requirements. This integration is a specific technical implementation that provides a distinct performance advantage over generic transcoding solutions that apply uniform bit rate settings regardless of content type.

### U.S. Patent No. 9,826,259

70.     The '259 patent, entitled "Managed degradation of a video stream," lawfully issued on November 21, 2017. A true and correct copy of the '259 patent is attached as Exhibit 5.

71.     The '259 patent names Indra Laksono as inventor.

72.    BitHarmony owns by assignment the entire right and title in and to the '259 patent with the right to recover damages for infringement thereof, including the recovery of past and future damages.

73.    The written description of the '259 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what has been considered conventional or generic in the art at the time of the invention.

74.    The '259 patent claims are directed to addressing problems specific to particular computing and media processing technologies, including managing degradation of video streams in fixed bandwidth networks to prevent saturation and ensure consistent delivery of multiple streams. '259 patent at 8:61-9:19. For instance, the '259 patent explains that as media resolution increases (e.g., 1080i), standard network architectures at the time failed to maintain real-time delivery. The problem is not just bandwidth, but the physical inability of a fixed-capacity network to support the footprint of the stream. Specifically, the '259 patent explains that "[w]ith extremely high resolutions, such as the resolution of 1920×1080i used in high definition television (HDTV), the data transmission rate of such a video image stream will be very high even after compression... [some networks will] be physically and/or logistically incapable of simultaneously supporting multiple receiving/output devices." '259 patent at 1:35-54. "If the video sequence is choppy, is not synchronized, is delayed, or is not received by all the designated receiver client units, the representation of the display data does not meet the predetermined criteria...." *Id.* at 6:50-53. The '259 patent describes "managing a degradation... based on a

bandwidth of a transmission link" for instances when the "actual" time of transmission begins to drift from the "expected" time. *See generally* '259 Patent, *see also* cl. 12.

75.     To address the scenario where the actual time of transmission drifts from the expected time, the '259 Patent utilizes a feedback loop where the encoder determines the minimum bits required to reach a specific quality level. "The amount by which the resolution and/or precision of a victim stream v is [changed] based on the degree to which the actual frame transmission completion time... exceeds the estimated frame transmission completion time." *Id.* at 5:55-60.

76.     Existing methods for handling video streams in fixed bandwidth networks had a "transmission rate problem where "data transmission rate … will be very high even after compression," leading to a data storage requirements that are "prohibitively expensive." *Id.* at 1:28-43. Beyond storage, the '259 patent highlights a hardware mismatch where "many output devices are incapable of handling the transmission" due to resolution limitations. *Id.* at 43-48. The patent also describes a "fixed bandwidth" bottleneck where networks are "physically and/or logistically incapable of simultaneously supporting multiple receiving/output devices" because they lack a mechanism to manage network traffic to assure consistent and sustained delivery. *Id.* at 1:48-54. This lack of active management results in a "representation of the display data" that is "choppy, is not synchronized, [or] is delayed" whenever the network is "close to saturation." *See generally id.* at 6:40-56.

77.     The '259 patent addresses these technical bottlenecks by implementing an active orchestration system that manages "network traffic to assure consistent and sustained delivery" through a feedback loop. *Id.* at 6:33-39. To address network saturation, the patented solution monitors the "actual time of frame transmission completion" and, when it exceeds the "estimated

transmit time" by a "predetermined threshold," the system selects a stream to be "modified to transmit less data." *Id.* at 3:53-65; *see also id.* at Abstract; 2:25-56. This is achieved, for example, by changing "quantization factors... resulting in a decrease in the amount of data transmitted," a process technically consistent with adjustment of the Quantization Parameter (QP) to reduce bitrate while maintaining a target quality level. *Id.* at 4:11-32; 5:42-6:13. If bitrate reduction is insufficient, the solution may mitigate "fixed bandwidth" constraints by "managing degradation in transmission quality," wherein the system will "scale down" the resolution to ensure the media "is transmitted without exceeding a maximum allowed delay time." *Id.* at 2:10-3:20. Finally, to support multiple users on a single pipe, the system utilizes a "weighted priority scheme" to select "victim streams," mirroring the logic where individual renditions are dynamically throttled to ensure the aggregate "representation of the display data" meets the "predetermined criteria" for real-time playback. *Id.* at 3:66-4:32; 6:40-56.

78.     The inventive benefits of the '259 patent over prior solutions primarily stem from its approach to adaptive degradation at the stream level, rather than uniform compression, which allows selective reduction in data rate for victim streams while maintaining overall network stability. This bandwidth-agnostic method enables operations like multi-client broadcasting without full recompression, addressing prior art limitations where fixed compression obscures timing information, necessitating buffers and re-processing that consumes additional memory, bandwidth, and introduces latency. Furthermore, by embedding the patented solution within the gateway server, the invention reduces overload risks by preventing streams from exceeding tolerances in shared networks, lowers overall system overhead through fewer adjustments and no need for separate monitoring stages, and maintains compatibility with existing MPEG and similar systems via transcoding capabilities. These features collectively overcome the

inefficiencies, inflexibility, and vulnerabilities of prior non-adaptive compression methods, facilitating more efficient and reliable handling of multimedia content across various networks and applications.

79.     The systems and methods claimed in the '259 patent provide improved bandwidth management for video stream processing. Claim 12, for example, recites a method that incorporates multiple inventive concepts described in the '259 patent, including receiving a first data stream representative of a series of display frames; managing a degradation of the first data stream based on a bandwidth of a transmission link to generate a second data stream representative of the series of display frames, wherein a degree of degradation of the first data stream is incremented for successive portions of the second data stream until a first compressed portion of the second data stream is determined to be transmissible such that the second data stream will be displayed in real time; transmitting the second data stream via the transmission link; wherein the first compressed portion of the second data stream is determined to be transmissible such that the second data stream will be displayed in real time when an expected time of transmission of a second compressed portion of the second data stream via the transmission link is within a predetermined tolerance of an actual time of transmission of the second compressed portion of the second data stream via the transmission link; and wherein the first data stream is degraded to generate the second data stream using a first compression technique and wherein the degree of degradation is incremented based on implementing different compression parameters for each of the successive portion of the first data stream. Claim 1 offers a particular "how" for managing streams: systematically monitoring transmission times and degrading selected ones before saturation, ensuring data remains deliverable to clients. *Id.*

80.    The '259 patent claims are directed to a specific improvement in the functioning of a gateway media server, specifically the automated orchestration of an adaptive bandwidth footprint across a plurality of data streams to ensure "sustained delivery within acceptable parameters." *Id.* at 6:33-39. Rather than an abstract idea, the claims describe a technical implementation of an egress-aware rate control mechanism that solves the "transmission rate problem" inherent in certain networks. *Id.* at 1:22-38. The system provides a significant advantage by integrating a real-time feedback loop directly into the "transcoding vector processors," allowing the server to monitor the delta between the "actual time of frame transmission completion" and the "estimated transmit time." *Id.* at 3:54-65; 7:34-39. This integration facilitates a "steady state" where media is "transmitted without exceeding a maximum allowed delay time," effectively protecting the client-side buffer. *Id.* at 3:1-4.

81.    The patent introduces an on-the-fly approach where different compression parameters are incremented, which, for example, begins with the modification of quantization factors to reduce bitrate while attempting to maintain precision, only when the network is close to saturation. This transmission pipeline ensures that multiple media streams may be transmitted to multiple users, providing a distinct performance advantage over generic, static compression by managing degradation dynamically to fit the physical constraints of the transmission link.

**ACCUSED PRODUCTS AND ACTIVITIES**

82.    The Accused Products[1] include Amazon's streaming products and services, including Amazon's streaming videos, movies, shows, trailers, such as those available on Amazon Prime Video and the Amazon.com website. The Accused Products include, for example,

---

[1] The Accused Products are further defined in the exemplary charts attached as Exh. 6 – 10.

Amazon's products and services for content delivery provided to Prime Video partners for content delivery, such as Prime Video Slate and its predecessor services.

83.    The Accused Products are streaming products and services that Amazon has made, used, offered for sale, sold, and/or imported into the United States, and products and services that Amazon continues to make, use, offer for sale, sell, and/or import into the United States.

84.    Amazon Prime Video is owned and operated by Amazon.com. Amazon.com Services, a wholly owned subsidiary of Amazon.com, handles many operational and service-related functions across Amazon's ecosystem, including aspects of the marketplace, fulfillment, customer service, and digital services. For Amazon Prime Video streaming services, particularly in the United States and several other regions, the service is legally provided by Amazon.com Services (or its affiliates, depending on location). This is stated directly in the official Prime Video Terms of Use: "The terms are between users and the entity providing the service, which is often Amazon.com Services LLC (e.g., for global/US users) or regional affiliates like Amazon Digital UK Limited." https://www.primevideo.com/help?nodeId=202095490&view-type=content-only.

85.    Charts showing exemplary infringing functionality are showing in Exhibits 6-10.

86.    On information and belief, all Accused Products are configured and operate in substantially the same way with respect to the Asserted Patents asserted against those products.

87.    Upon information and belief, Amazon has had knowledge and notice of the Asserted Patents, and its infringement thereof, since the patents issued. Upon information and belief each defendant, as a technology company, regularly monitors video streaming technology

advances, and it monitored or was otherwise aware of the Asserted Patents, especially due to their impact on Amazon's plans for its own technology and streaming business.

88.    Despite having knowledge of the Asserted Patents prior to this Complaint being filed, upon information and belief, Amazon has never undertaken any serious investigation to form a good faith belief as to non-infringement or invalidity of the Asserted Patents. Instead, Amazon has continued to infringe one or more claims of the Asserted Patents.

89.    Alternatively, to the extent that Amazon avoided or otherwise lacked actual knowledge of the Asserted Patents and its infringement thereof, it was willfully blind. Upon information and belief, to the extent it lacked actual knowledge of infringement, prior to the filling of this action, Amazon deliberately avoided learning of infringement, despite subjectively believing that there was a high probability that it infringed Plaintiff's patents, and specifically the Asserted Patents, and was therefore willfully blind. Upon information and belief, Amazon lacks written policies disseminated to employees regarding monitoring or avoidance of patent infringement by Amazon and lacks mechanisms for employees to report patents which they believe Amazon may infringe. Upon information and belief, Amazon and its employees subjectively understood that there was a high likelihood that patents filed on innovations by Plaintiff read on the Accused Products.

90.    At least as of the commencement of this action, Amazon has both actual knowledge and notice of the Asserted Patents, and it continues to willfully infringe the Asserted Patents.

91.    Therefore, upon information and belief, Amazon's infringement of the Asserted Patents has been and continues to be willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate, entitling BitHarmony to increased

damages pursuant to 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

92.    Upon information and belief, Amazon derives revenue, directly and indirectly, from the activities relating to the Accused Products.

### COUNT I - INFRINGEMENT OF U.S. PATENT NO. 7,707,485

93.    The allegations set forth in paragraphs 1 through 92 of this Complaint are incorporated by reference as though fully set forth herein.

94.    Pursuant to 35 U.S.C. § 282, the '485 patent is presumed valid.

95.    Amazon infringes the '485 patent by making, using, selling, offering for sale and/or importing to the United States products and/or methods covered by one or more claims of this Asserted Patent.

96.    On information and belief, Amazon has infringed and continues to infringe one or more claims of the '485 patent, including but not limited to claim 1, pursuant to 35 U.S.C. § 271, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, or importing in the United States the Accused Products, and/or exporting Accused Products.

97.    Amazon makes, uses, sells, offers for sale, and/or imports the Accused Products in this District and elsewhere in the United States, and thus directly infringes the '485 patent.

98.    For example, attached as **Exhibit 6** is a chart setting forth a description of at least one example of Amazon's infringement of at least claim 1 of the '485 patent. The descriptions and infringement theories in Exhibit 6 are preliminary and based on publicly available information. BitHarmony expects to further develop infringement evidence after obtaining discovery from Amazon in the course of this case. For example, Amazon Prime Video services,

28

through, for example, AWS Elemental MediaConvert and AWS Elemental MediaLive, perform the claimed method for adaptive bit rate streaming in claim 1. *See* Ex. 6.

99.     For example, and in accordance with claim 1, Amazon Prime Video uses AWS Elemental Media Convert's Automated ABR Configuration for adaptive bit rate streaming, which "automatically customizes the ABR (Adaptive Bit Rate) encoding configuration for each source video….when you create ABR packages today you're required to carefully select the bitrates, resolutions, and the quantity and distribution of renditions. The ideal package configuration varies depending on the specific content being encoded, because the visual complexity of the content affects how the content can best be compressed. Automated ABR Configuration automates this setup for you and allows MediaConvert to pick the ideal rendition configuration based on a content classification analysis performed during the encoding process. Leveraging Quality-Defined Variable Bitrate (QVBR) mode in MediaConvert to optimize the bitrate efficiency of each rendition, Automated ABR Configuration further optimizes the ABR package size by preventing redundant or overlapping renditions within each package…." *See* https://aws.amazon.com/about-aws/whats-new/2020/11/automated-abr-configuration-now-available-in-aws-elemental-mediaconvert/. Amazon's use thus directly infringes. *See* Ex. 6.

100.    For example, and also in accordance with claim 1, Amazon Prime Video's uses AWS Elemental MediaLive for adaptive bit rate streaming, which provides a live streaming workflow that, among other things, transcodes the input multimedia content into other formats and packages that a playback device (such as smart phone or smart TV). *See, e.g.*, https://docs.aws.amazon.com/medialive/latest/ug/what-is.html; https://docs.aws.amazon.com/medialive/latest/ug/how-medialive-works-channels.html (AWS Elemental MediaLive "ingests the source content from the upstream system" and "transcodes

that video (and the related audio, captions, and metadata) and creates outputs. MediaLive sends the outputs to the specified downstream systems.");

https://docs.aws.amazon.com/solutions/latest/live-streaming-on-aws/solution-overview.html (AWS Elemental MediaLive "encodes and packages your content for adaptive bitrate streaming across multiple screens"). Amazon's use thus directly infringes. *See* Ex. 6.

101.    Amazon also directs and controls customers' use of, e.g., Amazon Prime Video. For example, customers' access and use of Amazon Prime Video products and services is governed at least by the Amazon Prime Video Terms of Use – Global, https://www.primevideo.com/help?nodeId=202095490&view-type=content-only, Amazon Prime Video Usage Rules, https://www.primevideo.com/help?nodeId=202095500, Prime Video Slate Terms of Use, https://videocentral.amazon.com/support/legal/prime-video-slate-terms-of-use, and Prime Video Slate Self-Publishing Partner Digital License, https://videocentral.amazon.com/support/legal/self-publishing-partner-digital-license-agreement.

102.    Amazon also has induced and continues to induce infringement of the '485 patent pursuant to 35 U.S.C. § 271, including at least claim 1, by actively encouraging others to make, use, sell, offer to sell, and/or import in the United States the Accused Products, including by encouraging their customers to use the Accused Products to transcode multimedia data.

103.    Using the Accused Products constitutes direct infringement, literally or under the doctrine of equivalents, of at least claim 1 of the '485 patent, as described, for example, in Exhibit 6.

104.    Amazon's acts of encouragement include: providing to third parties and intending that third parties purchase and use the Accused Products, providing instructions on how to do so, purposefully and voluntarily placing the Accused Products in the stream of commerce with the

expectation that they will be used by customers in the United States including in the Eastern District of Virginia. Furthermore, Amazon has actual knowledge of how the Accused Products operate, including how use infringes the '485 patent. Amazon has undertaken these acts of encouragement with the specific intent that customers use of such Accused Products as intended by Amazon in a manner that infringes the asserted claims of the '485 patent.

105.    Amazon knowingly and intentionally encourages at least customers of Amazon's Accused Prime Video services to directly infringe the '485 patent. For example, Amazon provides instructions to customers so that such customers will use AWS Elemental MediaConvert and AWS Elemental MediaLive to transcode multimedia data in an infringing manner for streaming video through Amazon Prime Video, and Amazon further provides Prime Video Slate instructions to customers so that such customers will use Prime Video Slate to ingest and transcode media data in an infringing manner. *See, e.g.*, https://videocentral.amazon.com/support/welcome-to-prime-video-slate; https://videocentral.amazon.com/support/welcome-to-prime-video-slate/getting-started/self-publishing-contract-partners; https://videocentral.amazon.com/support/media-licensing-requirements/global-tvod-requirements; https://videocentral.amazon.com/support/delivery-overview; https://aws.amazon.com/solutions/case-studies/amazon-prime-video/ ("Amazon Prime Video uses the Amazon Web Service (AWS) Cloud as the underlying technology for all its services. 'AWS gives us the flexibility, elasticity, and reliability we require,' [Global Head of Digital Video Playback and Delivery, Amazon Video, BA] Winston says.").

106.    Amazon's customers' use of AWS Elemental MediaConvert, AWS Elemental MediaLive to stream Amazon Prime Video constitutes direct infringement of the '485 patent, as described, for example, in Exhibit 6. Amazon knowingly induces such infringement by providing

the Accused Products and instructions to enable and facilitate infringement as described above. At least as of the date of filing of the Complaint in this matter, Amazon knows that the induced conduct would constitute infringement—and intend that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct has been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

107.    Amazon's infringement of the '485 patent is willful, at least since Amazon's knowledge of its infringement as described above.

108.    Amazon's acts of infringement have caused and continue to cause damage to BitHarmony, and BitHarmony is entitled to recover from Amazon damages sustained as a result of Amazon's infringement of the '485 patent, but in no event less than a reasonable royalty.

109.    To the extent required, BitHarmony and its predecessors-in-interest has satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '485 patent, and BitHarmony is entitled to damages for Amazon's past infringement.

**COUNT II - INFRINGEMENT OF U.S. PATENT NO. 9,088,805**

110.    The allegations set forth in paragraphs 1 through 109 of this Complaint are incorporated by reference as though fully set forth herein.

111.    Pursuant to 35 U.S.C. § 282, the '805 patent is presumed valid.

112.    Amazon infringes the '805 patent by making, using, selling, offering for sale and/or importing to the United States products and/or methods covered by one or more claims of this Asserted Patent.

113.    On information and belief, Amazon has infringed and continues to infringe one or more claims of the '805 patent, including but not limited to claim 9, pursuant to 35 U.S.C. § 271, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, or importing in the United States the Accused Products and/or exporting Accused Products.

114.    Amazon makes, uses, sells, offers for sale, and/or imports the Accused Products in this District and elsewhere in the United States, and thus directly infringes the '805 patent.

115.    For example, attached as **Exhibit 7** is a chart setting forth a description of at least one example of Amazon's infringement of at least claim 9 of the '805 patent. The descriptions and infringement theories in Exhibit 7 are preliminary and based on publicly available information. BitHarmony expects to further develop infringement evidence after obtaining discovery from Amazon in the course of this case and will provide such information as discovered. For example, the Amazon Prime Video services, through, for example, AWS Media Convert, Amazon S3 and AWS KMS, perform the claimed method for key encryption/decryption for Amazon Prime Video as described in claim 9. *See* Ex. 7.

116.    For example, and in accordance with claim 9, Amazon Prime Video in an AWS video workflow is ingested into Amazon S3 and encrypted with keys managed through AWS KMS. When transcoding is required, AWS Elemental MediaConvert retrieves the encrypted files from S3 decrypts the media with KMS keys, converts the content into the applicable streaming formats and bitrates, and outputs the resulting renditions back into S3, where they remain encrypted. Amazon's use thus directly infringes. *See* Ex. 7.

117.    Amazon also directs and controls customers' use of, e.g., Amazon Prime Video. For example, customers' access and use of Amazon Prime Video products and services is governed at least by the Amazon Prime Video Terms of Use – Global,

https://www.primevideo.com/help?nodeId=202095490&view-type=content-only, Amazon Prime

Video Usage Rules, https://www.primevideo.com/help?nodeId=202095500, Prime Video Slate

Terms of Use, https://videocentral.amazon.com/support/legal/prime-video-slate-terms-of-use,

and Prime Video Slate Self-Publishing Partner Digital License,

https://videocentral.amazon.com/support/legal/self-publishing-partner-digital-license-agreement.

118.    Amazon also has induced and continues to induce infringement of the '805 patent

pursuant to 35 U.S.C. § 271, including at least claim 9, by actively encouraging others to make,

use, sell, offer to sell, and/or import in the United States, Amazon Prime Video services that

include the Accused Products, including by encouraging or requiring customers to use the

Accused Products to perform key encryption/decryption of video data.

119.    Using the Accused Products constitutes direct infringement, literally or under the

doctrine of equivalents, of at least claim 9 of the '805 patent, as described, for example, in

Exhibit 7.

120.    Amazon's acts of encouragement include: providing to users of Amazon Prime

Video services and intending that said users purchase and use the Accused Products, providing

instructions on how to do so, purposefully and voluntarily placing the Accused Products in the

stream of commerce with the expectation that they will be used by customers in the United States

including in the Eastern District of Virginia. Furthermore, Amazon has actual knowledge of how

the Accused Products operate, including how use infringes the '805 patent. Amazon has

undertaken these acts of encouragement with the specific intent that customers use of such the

Accused Key Products as intended by Amazon in a manner that infringes the asserted claims of

the '805 patent.

121.    Amazon knowingly and intentionally encourages at least customers of Amazon's Accused Prime Video services to directly infringe the '805 patent. For example, Amazon provides instructions to customers so that such customers will use Amazon S3, AWS Elemental MediaConvert and AWS KMS to encrypt and decrypt video data in an infringing manner for streaming video through Amazon, and, Amazon further provides Prime Video Slate instructions to customers so that such customers will use Prime Video Slate to ingest and key encrypt and decrypt video data in an infringing manner. *See, e.g.*,

https://videocentral.amazon.com/support/welcome-to-prime-video-slate;

https://videocentral.amazon.com/support/welcome-to-prime-video-slate/getting-started/self-publishing-contract-partners; https://videocentral.amazon.com/support/media-licensing-requirements/global-tvod-requirements; https://videocentral.amazon.com/support/delivery-overview; https://aws.amazon.com/solutions/case-studies/amazon-prime-video/ ("Amazon Prime Video uses the Amazon Web Service (AWS) Cloud as the underlying technology for all its services. 'AWS gives us the flexibility, elasticity, and reliability we require,' [Global Head of Digital Video Playback and Delivery, Amazon Video, BA] Winston says.").

122.    Amazon Prime Video and customers' use of Amazon S3, Media Convert and AWS KMS constitutes direct infringement of the '805 patent, as described, for example, in Exhibit 7. Amazon knowingly induces such infringement by providing the Accused Products and instructions to enable and facilitate infringement as described above. At least as of the date of filing of the Complaint in this matter, Amazon knows that the induced conduct constitutes infringement—and intends that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct has been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing

circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

123.    Amazon's infringement of the '805 patent is willful, at least since Amazon's knowledge of its infringement as described above.

124.    Amazon's acts of infringement have caused and continue to cause damage to BitHarmony, and BitHarmony is entitled to recover from Amazon damages sustained as a result of Amazon's infringement of the '805 patent, but in no event less than a reasonable royalty.

125.    To the extent required, BitHarmony and its predecessors-in-interest has satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '805 patent, and BitHarmony is entitled to damages for Amazon's past infringement.

## COUNT III - INFRINGEMENT OF U.S. PATENT NO. 9,124,954

126.    The allegations set forth in paragraphs 1 through 125 of this Complaint are incorporated by reference as though fully set forth herein.

127.    Pursuant to 35 U.S.C. § 282, the '954 patent is presumed valid.

128.    Amazon infringes the '954 patent by making, using, selling, offering for sale and/or importing to the United States products and/or methods covered by one or more claims of this Asserted Patent.

129.    On information and belief, Amazon has infringed and continues to infringe one or more claims of the '954 patent, including but not limited to claim 1, pursuant to 35 U.S.C. § 271, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, or importing in the United States the Accused Products.

130.    For example, attached as **Exhibit 8** is a chart setting forth a description of at least one example of Amazon's infringement of at least claim 1 of the '954 patent. The descriptions

36

and infringement theories in Exhibit 8 are preliminary and based on publicly available information. BitHarmony expects to further develop infringement evidence after obtaining discovery from Amazon in the course of this case. For example, Amazon Prime Video services with the X-Ray feature, through, for example, servers and services with Rekognition, provide and use the claimed video processing device of claim 1. *See* Ex. 8.

131.    For example, and in accordance with claim 1, Amazon Prime Video with X-Ray, which is a content recognition feature, uses Amazon Rekognition for video analysis, including, for example, Celebrity Rekognition that runs on top of video to, for example, detect and recognize faces in the video and display the name and face of the actor. *See, e.g.,*

https://www.aboutamazon.com/news/entertainment/what-is-x-ray-on-prime-video. X-Ray provides a "deeper dive" into the content—for example, "X-Ray helps viewers dive deeper into what they're watching by offering information about the cast, soundtrack, and other production details." *Id.* Amazon's use thus directly infringes. *See* Ex. 8.

132.    Amazon also directs and controls customers' use of, e.g., Amazon Prime Video. For example, customers' access and use of Amazon Prime Video products and services is governed at least by the Amazon Prime Video Terms of Use – Global,

https://www.primevideo.com/help?nodeId=202095490&view-type=content-only, Amazon Prime Video Usage Rules, https://www.primevideo.com/help?nodeId=202095500, Prime Video Slate Terms of Use, https://videocentral.amazon.com/support/legal/prime-video-slate-terms-of-use, and Prime Video Slate Self-Publishing Partner Digital License,

https://videocentral.amazon.com/support/legal/self-publishing-partner-digital-license-agreement.

133.    Amazon also has induced and continues to induce infringement of the '954 patent pursuant to 35 U.S.C. § 271, including claim 1, by actively encouraging others to make, use, sell,

offer to sell, and/or import in the United States the Accused Products, including by encouraging customers to use the Accused Products to analyze video data and generate content recognition data based on the video.

134.    Using the Accused Video products constitutes direct infringement, literally or under the doctrine of equivalents, of at least claim 1 of the '954 patent, for example, as described in Exhibit 8.

135.    Amazon's acts of encouragement include: providing to users and customers and intending that users and customers purchase and use the Accused Products, providing instructions on how to do so, purposefully and voluntarily placing the Accused Products in the stream of commerce with the expectation that they will be used by customers in the United States including in the Eastern District of Virginia. Furthermore, Amazon has actual knowledge of how the Accused Content Recognition and Services operate, including how use infringes the '954 patent. Amazon has undertaken these acts of encouragement with the specific intent that customers use of such the Accused Products as intended by Amazon in a manner that infringes the asserted claims of the '954 patent.

136.    Amazon knowingly and intentionally encourages at least customers of Amazon's Accused Prime Video services to directly infringe the '954 patent. For example, Amazon provides, among other things, instructions to customers so that such customers will use Amazon Prime Video with X-Ray in an infringing manner, and instructions to customers so that customers will use Prime Video State to ingest and process video in an infringing manner. *See, e.g.*, https://www.aboutamazon.com/news/entertainment/what-is-x-ray-on-prime-video ( providing "step-by-step guide to access and use X-Ray while you're watching Prime Video"); https://www.amazon.com/salp/xray (instructions for how to use X-Ray when watching videos);

https://videocentral.amazon.com/support/welcome-to-prime-video-slate;

https://videocentral.amazon.com/support/welcome-to-prime-video-slate/getting-started/self-publishing-contract-partners; https://videocentral.amazon.com/support/media-licensing-requirements/global-tvod-requirements; https://videocentral.amazon.com/support/delivery-overview; https://aws.amazon.com/solutions/case-studies/amazon-prime-video/ ("Amazon Prime Video uses the Amazon Web Service (AWS) Cloud as the underlying technology for all its services. 'AWS gives us the flexibility, elasticity, and reliability we require,' [Global Head of Digital Video Playback and Delivery, Amazon Video, BA] Winston says.").

137.    Amazon's customers' use of Amazon Prime Video with X-Ray constitutes direct infringement of the '954 patent, as described, for example, in Exhibit 8. Amazon's customers directly infringe by using the Accused Products. Amazon knowingly induces such infringement by providing the Accused Products and instructions to enable and facilitate infringement as described above. At least as of the date of filing of the Complaint in this matter, Amazon knows that the induced conduct would constitute infringement—and intend that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct has been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

138.    Amazon's infringement of the '954 patent is willful, at least since Amazon's knowledge of its infringement as described above.

139.    Amazon's acts of infringement have caused and continue to cause damage to BitHarmony, and BitHarmony is entitled to recover from Amazon damages sustained as a result of Amazon's infringement of the '954 patent, but in no event less than a reasonable royalty.

140.    To the extent required, BitHarmony and its predecessors-in-interest has satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '954 patent, and BitHarmony is entitled to damages for Amazon's past infringement.

### COUNT IV - INFRINGEMENT OF U.S. PATENT NO. 9,258,605

141.    The allegations set forth in paragraphs 1 through 140 of this Complaint are incorporated by reference as though fully set forth herein.

142.    Pursuant to 35 U.S.C. § 282, the '605 patent is presumed valid.

143.    Amazon infringes the '605 patent by making, using, selling, offering for sale and/or importing to the United States products and/or methods covered by one or more claims of this Asserted Patent.

144.    On information and belief, Amazon has infringed and continues to infringe one or more claims of the '605 patent, including but not limited to claim 19, pursuant to 35 U.S.C. § 271, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, or importing in the United States the Accused Products and/or exporting Accused Products.

145.    Amazon makes, uses, sells, offers for sale, and/or imports the Accused Products in this District and elsewhere in the United State, and thus directly infringes the '605 patent.

146.    For example, attached as **Exhibit 9** is a chart setting forth a description of at least one example of Amazon's infringement of at least claim 19 of the '605 patent. The descriptions and infringement theories in Exhibit 9 are preliminary and based on publicly available information. BitHarmony expects to further develop infringement evidence after obtaining discovery from Amazon in the course of this case. For example, Amazon Prime Video services, through, for example, AWS Elemental MediaConvert and Amazon S3, produces video processed by the claimed system having a storage device, an interface, a content analyzer, and a transcoder

that is configured to transrate multimedia data to generate transrated multimedia data having a peak bit rate not greater than a peak bit rate limit and having an average bit rate not greater than the average bit rate limit. *See* Ex. 9.

147.　For example, and in accordance with claim 19, once Amazon Prime Video data is ingested, AWS Elemental Media Convert's Automated ABR Configuration "automatically customizes the ABR (Adaptive Bit Rate) encoding configuration for each source video….When you create ABR packages today you're required to carefully select the bitrates, resolutions, and the quantity and distribution of renditions. The ideal package configuration varies depending on the specific content being encoded, because the visual complexity of the content affects how the content can best be compressed. Automated ABR Configuration automates this setup for you and allows MediaConvert to pick the ideal rendition configuration based on a content classification analysis performed during the encoding process. Leveraging Quality-Defined Variable Bitrate (QVBR) mode in MediaConvert to optimize the bitrate efficiency of each rendition, Automated ABR Configuration further optimizes the ABR package size by preventing redundant or overlapping renditions within each package…." *See, e.g.*, https://aws.amazon.com/about-aws/whats-new/2020/11/automated-abr-configuration-now-available-in-aws-elemental-mediaconvert/. Amazon's use thus directly infringes.

148.　Amazon also directs and controls customers' use of, e.g., Amazon Prime Video. For example, customers' access and use of Amazon Prime Video products and services is governed at least by the Amazon Prime Video Terms of Use – Global, https://www.primevideo.com/help?nodeId=202095490&view-type=content-only, Amazon Prime Video Usage Rules, https://www.primevideo.com/help?nodeId=202095500, Prime Video Slate Terms of Use, https://videocentral.amazon.com/support/legal/prime-video-slate-terms-of-use,

and Prime Video Slate Self-Publishing Partner Digital License,

https://videocentral.amazon.com/support/legal/self-publishing-partner-digital-license-agreement.

149.    Amazon also has induced and continues to induce infringement of the '605 patent pursuant to 35 U.S.C. § 271, including at least claim 19, by actively encouraging others to make, use, sell, offer to sell, and/or import in the United States, the Accused Products, including by encouraging customers to use the Accused Products to transcode multimedia data.

150.    Using the Amazon Products constitutes direct infringement, literally or under the doctrine of equivalents, of at least claim 19 of the '605 patent, as described, for example, in Exhibit 9.

151.    Amazon's acts of encouragement include: providing to third parties and intending that third parties purchase use Accused Products, providing instructions on how to do so, purposefully and voluntarily placing the Accused Products in the stream of commerce with the expectation that they will be used by customers in the United States including in the Eastern District of Virginia. Furthermore, Amazon has actual knowledge of how the Accused Products operate, including how use infringes the '605 patent. Amazon has undertaken these acts of encouragement with the specific intent that customers use of such Accused Products as intended by Amazon in a manner that infringes the asserted claims of the '605 patent.

152.    Amazon knowingly and intentionally encourages at least customers of Amazon's Accused Prime Video services to directly infringe claim 19 of the '605 patent. For example, Amazon provides instructions to customers so that such customers will use AWS Elemental MediaConvert to transcode multimedia data in an infringing manner and use Amazon S3 in an infringement manner for streaming video through Amazon Prime, and Amazon further provides Prime Video Slate instructions to customers so that such customers will use Prime Video Slate to

ingest and transcode media data in an infringing manner and use a storage device in an infringing manner. *See, e.g.*, https://videocentral.amazon.com/support/welcome-to-prime-video-slate; https://videocentral.amazon.com/support/welcome-to-prime-video-slate/getting-started/self-publishing-contract-partners; https://videocentral.amazon.com/support/media-licensing-requirements/global-tvod-requirements; https://videocentral.amazon.com/support/delivery-overview; https://aws.amazon.com/solutions/case-studies/amazon-prime-video/ ("Amazon Prime Video uses the Amazon Web Service (AWS) Cloud as the underlying technology for all its services. 'AWS gives us the flexibility, elasticity, and reliability we require,' [Global Head of Digital Video Playback and Delivery, Amazon Video, BA] Winston says.").

153.    Amazon Prime Video and Amazon's customers' use of Amazon Prime Video services and use of AWS Elemental MediaConvert, Amazon S3 to stream Amazon Prime Video constitutes direct infringement of the '605 patent, as described, for example, in Exhibit 9. Amazon knowingly induces such infringement by providing the Accused Storage Products and instructions to enable and facilitate infringement as described above. At least as of the date of filing of the Complaint in this matter, Amazon knows that the induced conduct would constitute infringement—and intends that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct has been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

154.    Amazon's infringement of the '605 patent is willful, at least since Amazon's knowledge of its infringement as described above.

155.    Amazon's acts of infringement have caused and continue to cause damage to BitHarmony, and BitHarmony is entitled to recover from Amazon damages sustained as a result of Amazon's infringement of the '605 patent, but in no event less than a reasonable royalty.

156.    To the extent required, BitHarmony and its predecessors-in-interest has satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '605 patent, and BitHarmony is entitled to damages for Amazon's past infringement.

**COUNT V - INFRINGEMENT OF U.S. PATENT NO. 9,826,259**

157.    The allegations set forth in paragraphs 1 through 156 of this Complaint are incorporated by reference as though fully set forth herein.

158.    Pursuant to 35 U.S.C. § 282, the '259 patent is presumed valid.

159.    Amazon infringes the '259 patent by making, using, selling, offering for sale and/or importing to the United States products and/or methods covered by one or more claims of this Asserted Patent.

160.    On information and belief, Amazon has infringed and continues to infringe one or more claims of the '259 patent, including but not limited to claim 12, pursuant to 35 U.S.C. § 271, literally or under the doctrine of equivalents, by making, using, selling, offering for sale, or importing in the United States the Accused Products and/or exporting Accused Products

161.    Amazon makes, uses, sells, offers for sale, and/or imports the Accused Products in this District and elsewhere in the United States, and thus directly infringes the '259 patent.

162.    For example, attached as **Exhibit 10** is a chart setting forth a description of at least one example of Amazon's infringement of at least claim 12 of the '259 patent. The descriptions and infringement theories in Exhibit 10 are preliminary and based on publicly available information. BitHarmony expects to further develop infringement evidence after

obtaining discovery from Amazon in the course of this case. For example, Amazon Prime Video services, through, for example, AWS Elemental MediaLive, AWS Elemental Live (including AWS Elemental Statmux) and IVS, perform the claimed method for adaptive bit rate streaming with managed degradation in claim 12. *See* Ex. 10.

163.    For example, and in accordance with claim 12, when using Amazon Prime Video services, AWS Elemental MediaLive, provides a live streaming workflow that, among other things, transcodes the input multimedia content into other formats and packages that a playback device (such as smart phone or smart TV). *See, e.g.*,

https://docs.aws.amazon.com/medialive/latest/ug/what-is.html. AWS Elemental MediaLive "ingests the source content from the upstream system" and "transcodes that video (and the related audio, captions, and metadata) and creates outputs. MediaLive sends the outputs to the specified downstream systems." *See* https://docs.aws.amazon.com/medialive/latest/ug/how-medialive-works-channels.html; *see also* https://docs.aws.amazon.com/solutions/latest/live-streaming-on-aws/solution-overview.html (AWS Elemental MediaLive "encodes and packages your content for adaptive bitrate streaming across multiple screens"). Further, and for example, when using Amazon Prime Video services, AWS Elemental Live (including AWS Elemental Statmux) and IVS, likewise provide adaptive bit rate streaming in accordance with claim 12. *See, e.g.*, Ex. 10. Amazon's use thus directly infringes. *See* Ex. 10.

164.    Amazon also directs and controls customers' use of, e.g., Amazon Prime Video. For example, customers' access and use of Amazon Prime Video products and services is governed at least by the Amazon Prime Video Terms of Use – Global, https://www.primevideo.com/help?nodeId=202095490&view-type=content-only, Amazon Prime Video Usage Rules, https://www.primevideo.com/help?nodeId=202095500, Prime Video Slate

Terms of Use, https://videocentral.amazon.com/support/legal/prime-video-slate-terms-of-use,

and Prime Video Slate Self-Publishing Partner Digital License,

https://videocentral.amazon.com/support/legal/self-publishing-partner-digital-license-agreement.

165. Amazon also has induced and continues to induce infringement of the '259 patent

pursuant to 35 U.S.C. § 271, including at least claim 12, by actively encouraging others to make,

use, sell, offer to sell, and/or import in the United States, the Accused Products, including by

encouraging customers to use the Accused Products for adaptive bit rate streaming with managed

degradation.

166. Using the Accused Amazon Products constitutes direct infringement, literally or

under the doctrine of equivalents, of at least claim 12 of the '259 patent, as described, for

example, in Exhibit 10.

167. Amazon's acts of encouragement include: providing to third parties and intending

that Amazon Prime Video customers and users use the Accused Products, providing instructions

on how to do so, purposefully and voluntarily placing the Accused Products in the stream of

commerce with the expectation that they will be used by customers in the United States

including in the Eastern District of Virginia. Furthermore, Amazon has actual knowledge of how

the Accused Products operate, including how use infringes the '259 patent. Amazon has

undertaken these acts of encouragement with the specific intent that customers use of the

Accused Products as intended by Amazon in a manner that infringes the asserted claims of the

'259 patent.

168. Amazon knowingly and intentionally encourages at least customers of Amazon's

Accused Prime Video services using live streaming products to directly infringe the '259 patent.

For example, Amazon provides instructions to customers so that such customers will use AWS

Elemental MediaLive, AWS Elemental Live, and Amazon IVS for adaptive bit rate streaming through Amazon Prime Video with managed degradation in an infringing manner, and Amazon further provides Prime Video Slate instructions to customers so that such customers will use Prime Video Slate to ingest and stream video with managed degradation in an infringing manner. *See, e.g.*, https://videocentral.amazon.com/support/welcome-to-prime-video-slate; https://videocentral.amazon.com/support/welcome-to-prime-video-slate/getting-started/self-publishing-contract-partners; https://videocentral.amazon.com/support/media-licensing-requirements/global-tvod-requirements; https://videocentral.amazon.com/support/delivery-overview; https://aws.amazon.com/solutions/case-studies/amazon-prime-video/ ("Amazon Prime Video uses the Amazon Web Service (AWS) Cloud as the underlying technology for all its services. 'AWS gives us the flexibility, elasticity, and reliability we require,' [Global Head of Digital Video Playback and Delivery, Amazon Video, BA] Winston says.").

169. Amazon Prime Video and Amazon's customers' use of Amazon Elemental MediaLive, AWS Elemental Live and Amazon IVS to stream Amazon Prime Video constitutes direct infringement of the '259 patent, as described, for example, in Exhibit 10. Amazon knowingly induces such infringement by providing the Accused Products and instructions to enable and facilitate infringement as described above. At least as of the date of filing of the Complaint in this matter, Amazon knows that the induced conduct would constitute infringement—and intend that infringement at the time of committing the aforementioned affirmative acts, such that the acts and conduct has been and continue to be committed with the specific intent to induce infringement—or deliberately avoided learning of the infringing circumstances at the time of committing these acts so as to be willfully blind to the infringement that was induced.

47

170.    Amazon's infringement of the '259 patent is willful, at least since Amazon's knowledge of its infringement as described above.

171.    Amazon's acts of infringement have caused and continue to cause damage to BitHarmony, and BitHarmony is entitled to recover from Amazon damages sustained as a result of Amazon's infringement of the '259 patent, but in no event less than a reasonable royalty.

172.    To the extent required, BitHarmony and its predecessors-in-interest has satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '259 patent, and BitHarmony is entitled to damages for Amazon's past infringement.

## JURY TRIAL DEMANDED

BitHarmony demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, BitHarmony respectfully requests that this Court:

A.    Enter judgment that Amazon has infringed and continues to infringe, directly and indirectly by inducement, one or more claims of each Asserted Patent, and that the Asserted Patents are valid and enforceable;

B.    Enter judgment that Amazon's acts of infringement are willful, at a minimum, on and after the date of the Complaint;

C.    Enter an order, pursuant to 35 U.S.C. § 284, awarding to BitHarmony monetary relief in an amount adequate to compensate for Amazon's infringement of the Asserted Patents, in an amount to be determined at trial, but not less than a reasonable royalty, as well as pre- and post-judgment interest and costs and enhanced damages for Amazon's willful infringement of the Asserted Patents;

D.      Enter an order that Amazon pay BitHarmony ongoing royalties in an amount to be determined for any infringement occurring after the date that judgment is entered;

E.      Enter an order, pursuant to 35 U.S.C. § 285, declaring this to be an exceptional case and thereby awarding to BitHarmony its reasonable attorneys' fees and costs; and

F.      Enter an order awarding to BitHarmony such other and further relief, whether at law or in equity, that this Court seems just, equitable, and proper.


Dated: December 23, 2025                       Respectfully submitted,

                                               *s/ Blair M. Jacobs*
                                               Blair M. Jacobs (VA Bar No. 32,010)
                                               bjacobs@bsfllp.com
                                               Christina A. Ondrick (VA Bar No. 45,736)
                                               condrick@bsfllp.com
                                               John S. Holley (*pro hac vice* forthcoming)
                                               jholley@bsfllp.com
                                               **BOIES SCHILLER FLEXNER LLP**
                                               1401 New York Avenue, NW
                                               Washington, D.C. 20005
                                               Telephone: (202) 237-2727
                                               Telecopier: (202) 237-6131

                                               *ATTORNEYS FOR PLAINTIFF*
                                               *BITHARMONY LLC*