IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| BITHARMONY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-02449 (AJT/WEF) |
| | ) | |
| AMAZON.COM, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion to Dismiss, [Doc. No. 15] ("the Motion"), and memoranda in support thereof, [Doc. Nos. 16, 34]. The Court held a hearing on the Motion on March 25, 2026, following which it took it under advisement. For the reasons stated herein, the Motion is GRANTED in part and DENIED in part.[1]

## I.    BACKGROUND

In this patent infringement lawsuit, Plaintiff BitHarmony ("Plaintiff" or "BitHarmony") alleges that the Amazon Defendants (Amazon.com and Amazon.Com Services LLC) have infringed and/or continue to infringe, directly and/or indirectly, the following BitHarmony patents: U.S. Patent Nos. 7,707,485 ("485 patent"), 9,088,805 ("805 patent"), 9,258,605 ("605 patent"), 9,124,954 ("954 patent") and 9,826,259 ("259 patent") (collectively, the "Asserted Patents") through Amazon's video streaming products and services, including Amazon Prime Video and Amazon.com videos. The Complaint alleges the following facts that are relevant to this Motion:

---

[1] Also before the Court is Plaintiff's Motion to File Sur-Reply, [Doc. No. 35], which is granted, and which the Court has considered.

1

Indra Laksono ("Laksono") is a scientist, inventor, and entrepreneur, and the named inventor on the 485, 605, 954, and 259 patents. [Doc. No. 1] ¶¶ 3, 29, 50, 60, 71. Laksono holds a Master of Science degree in Computer Science and Bachelor of Science degrees in Computer Science and Mathematics from the University of Toronto, and is the named inventor on over 90 issued U.S. and international patents, including in video codecs and streaming. *Id.* ¶ 3.

In 2001, Laksono co-founded ViXS Systems, Inc. ("ViXS"), headquartered in Toronto, Canada, serving as its Chief Technology Officer, overseeing software engineering, R&D, ASIC architecture, application development, and technology strategy. *Id.* ¶¶ 4–6, 8. Laksono served in this role until the company was acquired in 2017 by Pixelworks, Inc. ("Pixelworks"), following which Laksono became Pixelworks Canada's president. *Id.* ¶¶ 6, 10, 11.

ViXS was a semiconductor company that developed innovations enabling advanced transcoding and video processing technologies and received industry recognition and awards, including being listed for four years running as one of Deloitte's fastest growing North American companies. *Id.* ¶¶ 8–9. ViXS built a large patent portfolio (video processing, codecs, media-streaming, and other technologies) to protect ViXS's innovations, which resulted in over 470 patents issued and pending worldwide at the time of its acquisition in 2017 by Pixelworks, a leading provider of visual processing solutions. *Id.* ¶¶ 9–10. BitHarmony holds all substantial rights and interest in the Asserted Patents, including the exclusive right to sue for infringement and recover damages. *Id.* ¶ 15.

In their Motion to Dismiss, Defendants seek dismissal of Plaintiff's asserted claims related to the 485, 805, 605, and 954 patents.[2] [Doc. No. 16]. The alleged innovative capabilities of these patents are addressed in further detail below.

---

[2] Defendants do not seek dismissal of Count V of the Complaint alleging infringement of the 259 patent.

## A. <u>Patents at Issue</u>

### 1. *The 805 Patent*

Patent 805, titled "Encrypted Memory Device and Methods for Use Therewith," issued on July 21, 2015, [Doc. No. 1] ¶¶ 39–40, is directed at addressing problems specific to particular computing and media processing technologies, including the "security risk" inherent in traditional buffering where "clear compressed content resides in memory for a period of time," specifically the exposure that allows unauthorized parties to "read and export the compressed content" from the buffer. *Id.* ¶ 43 (citing [Doc. No. 1-3], 805 Patent, 1:25-2:24). The patent resolves this problem by employing a secure storage architecture where "memory input/output (I/O) includes encryption and decryption as part of an atomic operation to receive uncompressed video data and to generate encoded video data." [Doc. No. 1-3], 805 Patent, 19:5-14.

Claim 9 of the 805 patent, which Plaintiff asserts, recites:

A method for processing video data, the method comprising:
generating an encryption key and a corresponding decryption key;
receiving the video data in a media format via an interface device;
unconditionally encrypting the video data into encrypted video data based on the encryption key when unencrypted video data is received via the interface device; and storing the encrypted video data in a memory device;
automatically decrypting the encrypted video data based on the corresponding decryption key when retrieving the video data from the memory device in conjunction with an encoding of the video data by a video encoder.

*Id.*, 24:24-38

### 2. *The 485 Patent*

Patent 485, titled "System and Method for Dynamic Transrating Based on Content," issued on April 27, 2010, is directed at addressing problems specific to particular computing and media processing technologies, including the constraints of storage space and network bandwidth in digital video environments, specifically the inability of prior systems to optimize data efficiency

without sacrificing quality. [Doc. No. 1] ¶ 32. The patent resolves these problems by "dynamically modifying encoding parameters (such as bit rate or resolution) in response to real-time analysis of content characteristics like volume changes or motion vectors." *Id.* According to the patent, its inventive benefits over prior solutions stem from its approach to utilizing context-aware "rules templates" to drive encoding decisions based on "program information," rather than applying a single static compression standard across the entire file, which allows the system to "reduce the overall amount of multimedia data without materially affecting the multimedia content of the program." [Doc. No. 1-2], 485 Patent, 2:45-4:30. The systems and methods claimed in the 485 patent overcomes "[c]urrent multimedia storage solutions" that "face a choice of either content quality or storage space." *Id.*, 1:10-25.

Claim 1 of the 485 patent, which Plaintiff asserts, recites:

1. A method comprising:
   receiving, using a multimedia processing device, multimedia data representing multimedia content of a program;
   identifying a select template of a plurality of templates based on the program using the multimedia processing device, wherein the select template comprises a plurality of rules, each rule comprising a characteristic and one or more actions to be performed by multimedia processing device in association with the characteristic, the one or more actions comprising at least one action selected from a group consisting of changing a bit rate of the multimedia data; changing a resolution of the multimedia data; and changing an audio Volume of the multimedia data;
   analyzing the multimedia content using the multimedia processing device to determine characteristics of the multimedia content; and
   modifying, using the multimedia processing device, the multimedia databased on an application of the plurality of rules of the select template to the characteristics of the multimedia content.

*Id.*, 8:17-37.

### 3. *The 605 Patent*

Patent 605, titled "System and Method for Transrating Based on Multimedia Program Type" was issued on February 9, 2016 as a continuation of the 485 patent. [Doc. No. 1-5], 605

Patent, 1:7-12, 1:20-34. Specifically, the patent claims to overcome the inability of prior systems to adapt encoding constraints to the specific genre of content, by establishing "peak bit rate"[3] and "average bit rate"[4] limits based on the "multimedia program type" and scaling these limits. *Id.*, 2:23-35. The patent proposes reducing bit rate based on the content type, described as "transrating" so the video does not exceed the peak or average bit rate limits. *Id.*, 9:11-33.

Claim 19 of the 605 patent, which Plaintiff asserts, recites:

19. A system comprising:
    a storage device;
    an interface to receive multimedia data representative of a multimedia program;
    a content analyzer operably coupled to the interface and configured to:
        determine a multimedia program type of the multimedia program;
        determine a peak bit rate limit and an average bit rate limit based on the multimedia program type, the average bit rate limit being different than the peak bit rate limit; and
    a transcoder operably coupled to the interface and the content analyzer, the transcoder configured to transrate the multimedia data to generate transrated multimedia data having a peak bit rate not greater than the peak bit rate limit and having an average bit rate not greater than the average bit rate limit.

*Id.*, 13:1-18.

### 4. *The 954 Patent*

Patent 954, titled "Video Processing Device for Generating Time-Coded Metadata Based on a Search and Methods for Use Therewith" was issued on September 1, 2015, and is directed to the idea of recognizing data in a video and searching for and displaying information, such as advertisements, related to that recognized idea. [Doc. No. 1-4], 954 patent, 3:11-33. The patent's utilization of a "content analyzer" that "generates content recognition data based on the video signal" allows the system to mine alternative information sources for new information pertaining to a video signal. *Id.*, 1:30-49, 4:5-61.

---

[3] The peak bit rate limit represents the most data that can be transmitted at any given time. 605 patent, 3:54-64, 10:47-53.
[4] The average bit rate limit represents the average amount of data transmitted over a given time period. *Id.*

Claim 1 of the 954 patent, which Plaintiff asserts, recites:

1. A video processing device comprising:

a content analyzer that receives a video signal and generates content recognition data based on the video signal, wherein the content recognition data is associated with at least one timestamp included in the video signal and wherein the content recognition data includes at least one keyword generated by recognizing video content in the video signal as corresponding to the at least one keyword; and

a metadata search device, coupled to the content analyzer and at least one external source, that searches for information in response to the content recognition data and generates time-coded metadata in accordance with the at least one timestamp, the content recognition data and that includes the information, wherein the metadata search device searches the at least one external source, based on the at least one keyword, to identify the information.

*Id.*, 20:54-21:4.

## B. **Plaintiff's Claims**

Plaintiff brings five claims of infringement, alleging that Defendants infringe the five patents "by making, using, selling, offering for sale and/or importing to the United States products and/or methods covered by one or more claims of" the asserted patents in violation of 35 U.S.C. § 271. [Doc. No. 1] ¶¶ 95, 112, 128, 143, 159. Plaintiff further alleges that Defendants have "induced and continue[] to induce infringement of the" Asserted Patents in violation of 35 U.S.C. § 271 "by actively encouraging others to make, use, sell, offer to sell, and/or import in the United States, the Accused Products, including by encouraging customers to use the Accused Products for adaptive bit rate streaming with managed degradation." *Id.* ¶¶ 102, 118, 133, 149, 165. Plaintiff alleges that "Amazon has had knowledge and notice of the Asserted Patents, and its infringement thereof, since the patents issued," but "has never undertaken any serious investigation to form a good faith belief as to non-infringement or invalidity of the Asserted Patents." *Id.* ¶¶ 87–88. Alternatively, to the extent that Amazon avoided or otherwise lacked actual knowledge of the Asserted Patents and its infringement thereof, Plaintiff alleges that Amazon was willfully blind. *Id.* ¶ 89.

6

## II.   LEGAL STANDARD

The Patent Act provides that "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may be patented. 35 U.S.C. § 101. "[A]bstract ideas," together with "laws of nature [and] natural phenomena" are ineligible for patent protection. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012).[5] However, the Supreme Court has cautioned that "too broad [of] an interpretation of this exclusionary principle could eviscerate patent law [because] all inventions at some level embody, use, reflect, rest upon, or apply . . . abstract ideas." *Id.* at 71. Instead, "an *application* of a[n] . . . [abstract idea] to a known structure or process may well be deserving of patent protection." *Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (emphasis in original) (finding the process for molding rubber products was patentable where it implemented a mathematical formula to discover the process).

A patent is presumed valid, and a party asserting invalidity of a patent must show invalidity by clear and convincing evidence. *Microsoft Corp. v. 14l Ltd. P'ship*, 564 U.S. 91, 95 (2011). When analyzing the validity of a patent, the Supreme Court's *Alice* framework applies. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014). At Step One of the *Alice* analysis, the court must determine whether the patent covers an ineligible concept, such as an abstract idea, *id.* at 217, and for that purpose, the Court must consider the patent's claims "in their entirety to [determine] . . . their character as a whole." *McRO, Inc. v. Bandai Namco Games Am., Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016). If the asserted patent is for "a specific means or method that improves the relevant technology" rather than merely "a result or effect that itself is the abstract idea," then it is patent

---

[5] "[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it," thwarting the primary object of the patent laws. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012); *see also* U.S. CONST., art. I, § 8, cl. 8 (Congress "shall have Power . . . To promote the Progress of Science and useful Arts").

eligible and "the inquiry ends." *Id.* at 1314. In that regard, Step One asks "what the patent asserts to be the focus of the claimed advance over the prior art." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020) (internal quotations omitted). In answering this question, courts "must focus on the language of the Asserted Claims themselves," *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016), "considered in light of the specification," *Enfish, L.L.C. v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). Courts should "avoid importing concepts from the specification into the claims." *Longitude Licensing Ltd. v. Google LLC*, No. 2024-1202, 2025 WL 1249136, at *4 (Fed. Cir. Apr. 30, 2025); *see also GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1061 (Fed. Cir. 2026) ("Although the specification's (and prosecution history's) recitation of the problem faced and the asserted inventive solution informs the inquiry into what the combination of claimed features is directed to, *only features that are claimed, not unclaimed details that appear in the specification*, can supply something beyond ineligible matter—here, something beyond an abstract idea and sufficient to render the claim eligible.") (cleaned up) (emphasis added).

Under Step Two of the *Alice* analysis, even if a patent is abstract, it can nonetheless be eligible for protection if it adds an "inventive concept" - "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself.'" *Alice*, 573 U.S. at 217–218. Neither generic computer technology, "well-understood, routine, conventional" components and activities, nor "purely functional" elements can supply the required inventive concept. *Id.* at 221–26 (citation omitted). To provide an inventive concept, the claims of the asserted patent must claim a "technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a

conventional way)." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1351 (Fed. Cir. 2016).

"[P]atent eligibility can be determined at the Rule 12(b)(6) stage . . . when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). "[W]hether a claim recites patent eligible subject matter is a question of law which may contain underlying facts." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). The Court must accept "plausible and specific factual allegations that aspects of the claims are inventive," but not all allegations regarding inventiveness are sufficient to defeat a motion to dismiss, such as those "wholly divorced from the claims or the specification." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019). "Conclusory assertions about an inventive concept" are insufficient to render a claim inventive. *GoTV Streaming, LLC*, 166 F.4th at 1068.

## III.   DISCUSSION

In its Motion to Dismiss, Defendants seek dismissal under Rule 12(b)(6) on the basis that the patents "are directed to impermissibly abstract ideas—encrypting and decrypting data, classifying data and using the classifications to apply rules, identifying transmission limits for received data and modifying the data to comply with the limits, and recognizing data in a video to search for and show related information," and thus should be held ineligible and invalid under 35 U.S.C. § 101. [Doc. No. 16] at 1.[6]

---

[6] Defendants, in their Motion, also argue that the Complaint fails to state a claim for willful and induced infringement, [Doc. No. 16] at 25–29. However, since filing their Motion, Defendants have withdrawn that argument as a basis upon which to dismiss the Complaint. [Doc. No. 72]. Accordingly, the Court does not address these arguments.

A. **Validity of Patents Under 35 U.S.C. § 101.**

1. **Claim 9 of the 805 Patent**

Defendants argue that Claim 9 is drawn to "the abstract idea of encrypting and decrypting data, and adds no inventive concept." *Id.* at 9. Specifically, they argue that Claim 9 does not "describe any technological improvement to existing encryption and decryption methods" or "specify how to perform the claimed encryption and decryption." *Id.* at 10; *see Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1302 (Fed. Cir. 2020) ("The first such requirement, that of eligibility, is that the claim itself . . . must go beyond stating a functional result; it must identify 'how' that functional result is achieved by limiting the claim scope to structures specified at some level of concreteness.").

In response, Plaintiff contends that the Complaint alleges that 805 patent goes beyond "encrypting and decrypting data" because it solves a "security problem" where "clear compressed content resides in memory," allowing hackers to exploit unprotected video processing buffers and extract unencrypted content. [Doc. No. 33] at 9. Plaintiff argues that the Complaint pleads how the 805 patent solves this "security problem through an unconventional, hardware-based architecture that treats memory input/output as an 'atomic operation.'" *Id.* Specifically, Plaintiff contends that the patent utilizes a "key generator and an interface device to unconditionally encrypt data upon storage and automatically decrypt it during encoding," so as to "ensure[] unencrypted content is never exposed in memory components" to "provide[] a secure video processing architecture that improves data integrity via automatic encryption." *Id.*

Claim 9 of the 805 patent fails *Alice* Step One because it claims nothing more than manipulating data using conventional encryption and decryption. *See Personalized Media Commc'ns, LLC v. Amazon.com, Inc.*, 161 F. Supp. 3d 325, 333 (D. Del. 2015), *aff'd sub nom.*

10

*Personalized Media Commc'ns, LLC v. Amazon.com, Inc.*, 671 F. App'x 777 (Fed. Cir. 2016) (finding claim that "receiv[ed] an encrypted control signal and encrypted information, decrypt[ed] the control signal, us[ed] the signal to decrypt the information, and then present[ed] programing" was abstract because the claims recited the "abstract idea of decryption," which is merely converting information from one format to another). Nor does Plaintiff's claims that the 805 patent "unconditionally" and "automatically" encrypts data render the patent eligible for protection. *See Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) ("automation" of manual process of loan applications is ineligible subject matter); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (claims describing the "automation of the fundamental economic concept of offer-based price optimization through the use of generic-computer functions" are patent ineligible). Likewise, the other cases Plaintiff relies on are inapplicable because, unlike those claims that recited specific technological solutions to improve computer security and importantly described in detail how to effectuate those improvements, the Claim here simply describes steps to encrypt and decrypt data. *See Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348–49 (Fed. Cir. 2018), *as amended* (Nov. 20, 2018) ("Improving security—here, against a computer's unauthorized use of a program—can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem"); *TecSec, Inc.*, 978 F.3d 1278 (Fed. Cir. 2020) (patent claim recited a specific way of implementing "multi-level multimedia security" using an "object-oriented key manager" and "labels" to manage access to encrypted objects).[7]

---

[7] Plaintiff argues that Claim 9 utilizes a "key generator and an interface device to unconditionally encrypt data upon storage and automatically decrypt it during encoding, the invention ensures unencrypted content is never exposed in memory components," [Doc. No. 33] at 9. Even if the Court were to find that these steps are nongeneric, the Claim fails to go into any detail as to how its functional result is achieved.

11

With respect to *Alice* Step Two, Plaintiff contends Claim 9 is "inventive" because the "specific arrangement" of the encryption and decryption, in conjunction with an encoding of the video data departs from the conventional technique and provides a non-generic solution to a security problem inherent in encrypted videos. [Doc. No. 33] at 17. Plaintiff relies chiefly on *Bascom Global Internet Services*, where the Federal Circuit reversed the district court's determination on whether the claims were "inventive" under *Alice* Step Two, holding that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Glob. Internet Servs., Inc.*, 827 F.3d at 1352. The Federal Circuit held that the claim at issue, which was directed to "the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user" did more than "merely recite the abstract idea of filtering content" or "preempt all ways of filtering content on the Internet." *Id.* at 1350. Instead, the patent "describe[d] how its particular arrangement of elements [was] a technical improvement over prior art ways of filtering such content." *Id.* (patent at issue claimed a "technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a conventional way) to filter content on the Internet").

Defendants argue that Claim 9 is not "inventive" because it "recites only functional generic steps: 'generating an encryption key and a corresponding decryption key,' 'receiving the video data,' 'encrypting video data,' 'storing the encrypted video data,' and 'decrypting encrypted video data . . . in conjunction with an encoding of the video data.'" [Doc. No. 16] at 12 (quoting 805 patent, Claim 9). The Court agrees.

Unlike the claim in *Bascom*, Claim 9 of the 805 patent does not add a "non-conventional" or "non-generic arrangement of known, conventional pieces." The functional steps and

components of Claim 9 appear in their logical order: encryption and decryption keys must first be generated before data can be encrypted or decrypted using those respective keys. Once the keys are generated, and video is received, software can then encrypt the video using the encryption key and store the encrypted video in memory. When the encrypted video data is retrieved from memory, the video data is decrypted using the decryption key and can be encoded.

For these reasons, the Court concludes that Claim 9 of the 805 patent is drawn to the abstract idea of encrypting and decrypting data and adds no inventive concept.

### 2. Claim 1 of the 485 Patent

As to Claim 1 of the 485 patent, Defendants similarly argue that it fails both steps of the *Alice* analysis because it embodies an abstract idea that is non-inventive.

Claim 1 of the 485 patent, recites a "multimedia processing device" that receives a program, identifies a transcoding template (from a set of templates) based on that program, analyzes the multimedia content of the program, and modifies the program's multimedia data based on an application of the template's rules to the multimedia content's characteristics. [Doc. No. 33] at 18.

Defendants argue that Claim 1 of the 485 patent fails *Alice* Step One because, at its core, the claim classifies information and applies generic rules based on those classifications without providing any detail or explanation of how to accomplish these functional results. [Doc. No. 16] at 14–15. In response, Plaintiff, contends that Claim 1 of the 485 patent does not merely apply generic rules but is more like the "type of automated rule-based process [the Federal Circuit] found eligible in *McRO* due to its "analy[sis] [of] the multimedia content to detect specific content characteristics" to "modif[y] the bit rate, audio volume, and/or resolution." [Doc. No. 33] at 18– 19.

13

Here, unlike the claim at issue in *McRo*, where the Federal Circuit held that the claim at issue was not abstract because it recited a set of rules "with specific characteristics" that allowed for the improvement realized by the invention, Claim 1 of the 485 patent simply recites the basic result of classifying data and applying generic rules based on that classification but does not specify anything about how those rules would apply. *Compare* Claim 1, 485 Patent (A method comprising: . . . identifying a select template of a plurality of templates based on the program using the multimedia processing device, wherein the select template comprises a plurality of rules, each rule comprising a characteristic and one or more actions to be performed by multimedia processing device in association with the characteristic . . . .) *with McRO, Inc.*, 837 F.3d 1299 at 1307 (Claim 1 of the 576 patent: "A method for automatically animating lip synchronization and facial expression of three-dimensional characters comprising: obtaining a first set of rules that define output morph weight set stream as a function of phoneme sequence and time of said phoneme sequence).

Courts have routinely held that similar data classification and modification claims, without specifying how to achieve these results, are abstract. *See Longitude Licensing Ltd.*, 2025 WL 1249136, (claims drawn to an "image processing method," comprising "'determining' the main object image data," "acquiring" correction conditions, and "adjusting the picture quality" based on those correction conditions, were "directed to the same abstract idea of using data to identify an image's subject and modifying image data based on that subject."); *FairWarning IP, LLC v. Iatric Sys.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016) (holding claims that "generat[ed] a rule for monitoring audit log data," "appl[ied] the rule," "stor[ed], in a memory, a hit if the event has occurred," and "provid[ed] a notification," "merely implement[ed] an old practice in a new environment," and any purported benefit came "from the capabilities of a general-purpose computer, rather than the

14

patented method itself"). Because Claim 1 of the 485 patent is "framed entirely in functional, results-oriented terms," the Court finds it abstract.

As to Step Two of the *Alice* framework, in response to Defendants' contention that the patent is non-inventive because it only recites generic computer technology and neither introduces a technical improvement nor a new order to any of the proposed steps, Plaintiff contends that Defendants' characterization misses the fact that the claim uses "context-aware rules templates to drive encoding decisions." [Doc. No. 33] at 20; *see also id.* at 10 ("The Complaint details how the '485 patent solves this problem through an unconventional, hardware-based 'dynamic transrating' system that replaces static profiles with a 'rules template' indexed to device characteristics.").

At the outset, Claim 1 only discusses a "plurality of rules" that is applied via a "multimedia processing device" but it identifies no new technology or capability that this method utilizes. *See* 485 Patent, 8:17-37. And although the patent describes a set of "exemplary rules" to apply to the data such as "reduc[ing] bit rate for duration of identified commercial content," *id.*, Table 1, which is the alleged inventive benefit of the patent,[8] those "context-aware" rules do nothing more than perform the "ordinary function[] [of] carrying out [the] abstract idea" of data classification and modification. *GoTV Streaming, LLC*, 166 F.4th at 1068 (claim "fails to pass muster" at step two where "[t]here is no specificity . . . that might go beyond result-focused functional language").

For these reasons, the Court finds that Claim 1 of the 485 patent is drawn to the abstract idea of encrypting and decrypting data and adds no inventive concept.

---

[8] [Doc. No. 1] ¶ 36 ("The inventive benefits of the '485 patent over prior solutions primarily stem from its approach to utilizing context-aware 'rules templates' to drive encoding decisions based on 'program information,' rather than applying a single static compression standard across the entire file . . . .").

### 3. Claim 19 of the 605 Patent

Claim 19 of the 605 Patent advances "a system comprising: a storage device; an interface to receive multimedia data . . . a content analyzer . . . configured to determine a multimedia program type . . . [and] determine a peak bit rate limit and an average bit rate limit. . .; and a transcoder operably coupled to the interface and the content analyzer, the transcoder configured to transrate the multimedia data to generate transrated multimedia data having a peak bit rate not greater than the peak bit rate limit and having an average bit rate not greater than the average bit rate limit." 605 Patent, 13:1-18.

Defendants argue that Claim 19 of the 605 Patent is also abstract as it only recites functional steps without providing any "technical details for the tangible components." Defendants rely on *Entropic Commc'ns, LLC v. Dish Network Corp.* where the district court held that the challenged claim, with similar alleged inventive benefits to those asserted in Claim 19,[9] was directed to "the abstract idea of sending a request for data, receiving responses to the request, and either (1) allocating resources based upon the responses; or (2) determining and transmitting data concerning bandwidth based upon the responses" received from the network nodes, which were themselves generic computing components. 767 F. Supp. 3d 1023, 1035-36 (C.D. Cal. 2025).

In opposition, Plaintiff relies on *Visual Memory LLC v. NVIDIA Corp.*, which recited claims of "an enhanced computer memory system" that used "programmable operational characteristics . . . configurable based on the type of processor" to enable interoperability with multiple different processors. 867 F.3d 1259–60 (Fed. Cir. 2017). In concluding that the claims

---

[9] In *Entropic*, the challenged claim asserted a "communication method" for "broadcasting . . . a request for a guaranteed quality of service flow in the network," "receiving a first response," "receiving a second response . . . indicating whether the source node has available resources to support the guaranteed quality of service flow," and, if sufficient resources were not available, "determining a maximum data rate that would have resulted in a successful request" and transmitting that rate to the requesting node. 767 F. Supp. 3d 1023, 1030-31 (C.D. Cal. 2025).

16

were not directed to an abstract idea, the Federal Circuit held that the benefits of the invention were derived from the claimed "programmable operational characteristic," which could be implemented using code attached as an appendix to the patent. *Id.* at 1261 (patent attached "microfiche appendix having a combined total of 263 frames of computer code" that could be used to "configure a programmable operational characteristic of a cache memory . . . based on the type of processor connected to the memory system").

In contrast to the claim at issue in *Visual Memory LLC*, Claim 19 of the 605 Patent does not explain how to "determine a multimedia program type," "determine a peak bit rate limit and an average bit rate limit," or "transrate the multimedia data to generate transrated multimedia data having a peak bit rate not greater than the peak bit rate limit and having an average bit rate not greater than the average bit rate limit" as recited. Therefore, this Claim, whose inventive benefit is allegedly targeted hardware calibration to achieve performance improvement unattainable by conventional, static systems, [Doc. No 1] ¶¶ 66-69, "fails to provide any technical details for the tangible components," and therefore fails at step one. *Univ. of Fla. Rsch. Found., Inc. v. GE Co.*, 916 F.3d 1363, 1368 (Fed. Cir. 2019) (cleaned up); *Orostream LLC v. ABS-CBN Int'l*, C.A. 2:15-248-JRG, 2015 WL 5836949, at *3 (E.D. Tex. Oct. 1, 2015) (claim directed to "abstract idea of adjustment of the rate of information transfer based on feedback" was invalid under § 101).

As for Step Two of the *Alice* framework, the claimed "system" is composed of generic, off-the-shelf computing equipment, including a "storage device," an "interface," a "content analyzer," and a "transcoder." *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 614 (Fed. Cir. 2016) (server that "receive[d] data, extract[ed] classification information from the received data, and store[d] the digital images taking into consideration the classification information" was merely generic computing component). Plaintiff argues that the inventive benefits derive from the claim's

utilization of a peak bit rate limit in conjunction with an average bit rate limit based on the program type to address the inability of prior systems to adapt encoding constraints to the specific genre of content. [Doc. No. 33] at 22. As the patent specification explains, the invention optimizes visual quality by, for example, reallocating bit savings from low-complexity frames to high-complexity ones, dynamically adjusting the quantization parameter (compression) when the "bits difference" exceeds a calculated threshold. 605 Patent, 9:33-55.

Here, Claim 19 puts forward a targeted hardware calibration that enforces peak and average bit rate limits to ensure outputs never exceed those thresholds. And it is this simultaneous enforcement of the peak and average bit rate limits, Plaintiff alleges, that provides the inventive benefit. *See Cellspin Soft, Inc.*, 927 F.3d at 1316–17 (finding that plaintiff had plausibly alleged inventiveness of claim through allegations detailing why aspects of its claimed inventions were not conventional, *e.g.*, its two-step, two-device structure requiring a connection before data is transmitted). For those reasons, the finding that Claim 19 of the 607 Patent is directed at an abstract idea does not mandate a finding that it fails Alice Step Two; additional information obtained through discovery is needed in order to determine whether the claim limitations, either individually or as an ordered combination, teach implementing the abstract idea using something more than well understood, routine, or conventional techniques. *See Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022). Claim 19 therefore sufficiently recites an "inventive concept" that makes dismissal not warranted at this stage of the litigation.[10]

---

[10] That said, as discussed above with respect to the 485 Patent, which recited a "plurality of rules," the simultaneous enforcement of the peak and average bit rate limits may turn out to be nothing more than the use of "generic computers to perform generic computer functions," which the Federal Circuit has held is insufficient to transform an abstract idea into an inventive concept. *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016).

18

### 4. Claim 1 of the 954 Patent

Defendants once again argue that Claim 1 of the 954 Patent, which recites a "video processing device comprising: a content analyzer that receives a video signal and generated content recognition data . . . and a metadata search device . . . that searches for information in response to the content recognition data," is abstract. [Doc. No. 16] at 20–21. Plaintiff, in response, contends that Claim 1 of the 954 Patent provides "an automated video processing architecture that bridges the disconnect between static video and fragmented external data." [Doc. No. 33] at 23.

The Court finds that Claim 1 of the 954 Patent is directed at an abstract idea. At its core, the claim recites a system that receives and generates data, and uses that data to search external sources. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1344 (Fed. Cir. 2014) (holding that a claim directed to recognizing data in "hard copy documents" was directed to the abstract idea of "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions."); *see also Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1325, 1327 (Fed. Cir. 2017) (holding abstract an invention that "locat[ed] information in a database, and using an index that includes tags and metafiles to locate the desired information" because it was drawn to "the abstract idea of creating an index and using that index to search for and retrieve data").

Like the claims at issue in the above cases, Claim 1 of the 954 Patent receives and analyzes information, creates meta-data based on that information, and searches external sources. And even if, as Plaintiff argues, the generation of "time-coded metadata" is enough to make this claim non-abstract, the claim still fails Step One because the claim does not specify *how* time-coded metadata

19

alters the landscape to overcome "the "static nature of traditional video presentation." *Intell. Ventures I LLC*, 850 F.3d at 1328 ("The inclusion of XML tags as the chosen index building block, with little more, does not change that conclusion."). Searching an "external source" for information related to the content recognition data, like the search performed on the computer database claimed in *Intell. Ventures I*, is thus an abstract idea.

As to whether Claim 1 of the 954 Patent constitutes an "inventive concept" such that it is eligible for patenting, Plaintiff contends that "'954 patent's dynamic, time-coded metadata synchronization fundamentally departs from the prior art, thus resulting in an inventive concept." [Doc. No. 33] at 24. However, the Federal Circuit rejected a similar argument in *Intell. Ventures I*, discussed above. There, the plaintiff argued that the "claimed contribution lies in the utilization of an index constructed of specific XML tags and metadata to facilitate searches," and the Federal Circuit held that the "patentee's use of a well-known tag, i.e., XML tag—to form an index" "[did] not transform the claim into something beyond a conventional computer practice for facilitating searches." *Intell. Ventures I LLC*, 850 F.3d at 1329 ("[T]he claims do not sufficiently recite how the inclusion of XML tags or metadata leads to an improvement in computer database technology through some "non-conventional and non-generic arrangement of known, conventional pieces.").

For these reasons, the Court finds that Claim 9 of the 954 patent is drawn to the abstract idea of recognizing data in a video and searching for information related to the data for display in the video and adds no inventive concept.

### 5. Remaining Claims

Finally, Plaintiff opposes the Motion, arguing that it "must be denied" because it purportedly addresses only "hand-picked claims" that Defendants have not shown are "legally

representative of the remaining claims," and the Complaint states that the allegations were not limited to just the claims expressly mentioned. [Doc. No. 33] at 24–25.

As Defendants have acknowledged, they seek a determination of invalidity of only the asserted claims of the 485, 805, 954, and 605 patents, and not any of their dependent claims. [Doc. No. 34] at 16 n.7. Therefore, Defendants need not establish the representativeness of the challenged claims. *Cf. Cronos Techs., LLC v. Expedia, Inc.*, 2015 WL 5234040, at *2 (D. Del. Sept. 8, 2015) (denying motion to dismiss where defendants failed to establish claim was representative of dependent claims despite challenging both the claim *and* its dependent claims). And as Plaintiff acknowledged at the March 25, 2026 hearing, the Complaint has not adequately alleged the infringement of the remaining claims in each of the patents. *See* [Doc. No. 52], 03/27/2026 Tr. at 37.

## IV.  CONCLUSION

For the above reasons, it is hereby

**ORDERED** that Defendants' Motion to Dismiss, [Doc. No. 15], as amended by Defendants' partial withdrawal of certain arguments, [Doc. No. 72], is **GRANTED** as to Counts I (Patent 485), II (Patent 805) and Count III (Patent 954); and **DENIED** as to Count IV (Patent 605).

May 7, 2026
Alexandria, Virginia

_____
Anthony J. Trenga
Senior U.S. District Judge